Lawrence F. GLASER and Maureen Glaser, individually and on behalf of Kimberly, Erin, Hannah and Benjamin Glaser, Plaintiffs,

v.

ENZO BIOCHEM, INC.,
et al., Defendants.

No. CIV.A. 02–1242–A.

United States District Court,
E.D. Virginia,
Alexandria Division.

July 16, 2003.

---

Jorge RiosTorres, Annandale, VA, Plaintiff's Counsel.

Cooley Godward, Reston, Jeffrey Scott Tibbals, Pepper Hamilton, Tysons Corner, VA, Defendant's Counsel.

### *MEMORANDUM OPINION*

LEE, District Judge.

THIS MATTER is before the Court on Defendants', Enzo Biochem, Inc., Barry Weiner, Elazar Rabbani, Sharim Rabbani, John Delucca, Dean Engelhardt, and Heimon Gross, motions to dismiss pursuant to Rules 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure. This case concerns Plaintiffs' claim that Defendants defrauded them by disseminating allegedly false information to the public and by manipulating the Enzo Biochem, Inc., stock to permit the Defendants to "pump and dump" the Enzo stock. This is the Plaintiffs' fourth attempt at pursuing their claims against Defendants. Defendant Heimon Gross filed a separate motion to dismiss; however, his motion incorporates the other defendants' motion to a large extent. This Memorandum Opinion addresses all motions to dismiss before the Court, specifically the adequacy of Plaintiffs' Amended Complaint with respect to Rule 9(b) and the special pleading requirements of the Private Securities Litigation Reform Act, 15 U.S.C. § 78u–4(b), Rule 12(b)(6) and Section 10(b) of the Securities and Exchange Act of 1934. Furthermore, this Memorandum Opinion addresses the adequacy of Plaintiffs' Amended Complaint as to the common law fraud and the breach of fiduciary duty claims.

The first issue before the Court is whether Plaintiffs' federal securities fraud claims are barred by the relevant statute of limitations where Plaintiffs' allegedly had inquiry notice of the securities fraud more than one year prior to filing their first complaint before the Court. The Court holds that Plaintiffs' claims are governed and barred by the one-year statute of limitations because Plaintiffs, through several media, had acquired notice of their potential claim. The Court further holds that the two-year limitations period established by the recently enacted Sarbanes–Oxley Act does not revive Plaintiffs' claims.

The second issue is whether Plaintiffs' Amended Complaint adequately pleads a federal securities fraud claim, under 15 U.S.C. § 78u–4(b), to withstand Defendants' motions to dismiss for failure to plead fraud with particularity and failure to state a claim upon which relief can be granted, where the Amended Complaint alleges that Plaintiffs were induced, through several allegedly false and materially misleading communications from Defendants, into purchasing over one million shares of Enzo Biochem, Inc., stock. The Court holds that Plaintiffs' Amended Complaint fails to allege fraud "in connection with" the sale or purchase of a security, fails to establish a misrepresentation of material facts, fails to raise a strong inference that Defendants acted intentionally, consciously, or recklessly, fails to allege direct or indirect reasonable reliance, and fails to allege loss causation. The Amended Complaint also fails to allege common law fraud claims against all Defendants because the Amended Complaint does not establish material facts which were misrepresented. Furthermore, the Amended Complaint fails to state a proper claim for breach of fiduciary duty against the Defendants because this case was not initiated as a derivative claim. For the reasons set forth below, the Court dismisses the Amended Complaint as to all counts and as to all Defendants.

### I. BACKGROUND

Enzo Biochem, Inc., ("Enzo") is a publicly held biotechnology company engaged in

the research, development and marketing of health care products. The Individual Defendants are officers and/or directors of Enzo—Heimon Gross was a consultant to Enzo and allegedly engaged in investor relations. Plaintiff Lawrence Glaser ("Glaser") and his family purchased over one million shares of Enzo over a six-year period, from 1994 to 2000. Plaintiffs engaged in thousands of purchases and sales of Enzo stock during this period.

Plaintiffs claim that the Defendants made false statements concerning: (1) Enzo's patent estate, (2) the progress of the pre-clinical and clinical trials of Enzo's HIV protocol, (3) the efficacy of Enzo's gene therapy, and (4) the timing of a major diagnostic transaction with a pharmaceutical company. Plaintiffs further allege that the Defendants conspired to increase the price of the Enzo stock so that they could sell their holdings at favorable prices: a "pump and dump." The Amended Complaint alleges that, as part of the "pump and dump" scheme, the Defendants stated: (1) that the clinical trials of the HIV protocol were successful and on schedule, (2) that the Phase II clinical study would begin shortly, and (3) that Enzo would be opening clinics to treat HIV/AIDS patients in April 2000. As part of the "dump," the Defendants allegedly sold some of their shares at all-time high prices for the Enzo stock. The Amended Complaint also alleges that the Defendants planned to "pump and dump" the Enzo stock a second time but abandoned the plan.

## II. DISCUSSION

The Court grants the motions to dismiss as to the federal securities claims because (1) the federal securities claims are barred by the statute of limitations, (2) the Amended Complaint fails to plead material facts which were misrepresented, (3) the Amended Complaint fails to raise a strong inference that Defendants acted intentionally, consciously, or recklessly or that the Defendants had the motive and opportunity to defraud Enzo's investors, (4) fails to plead with particularity either direct or indirect reliance, and (5) fails to allege loss causation. The Court grants the motions to dismiss as to the common law fraud claims because the Amended Complaint fails to establish material facts which were misrepresented. Furthermore, the Court grants Plaintiffs' motions to dismiss as to the breach of fiduciary claim because the claim was not initiated as a derivative action.

### A. Standard of Review

#### 1. *Fed.R.Civ.P. 12(b)(6)—Failure to State a Claim Upon Which Relief May Be Granted*

A Rule 12(b)(6) motion should not be granted unless it appears beyond a doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief. Fed.R.Civ.P. 12(b)(6); *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). In considering a Rule 12(b)(6) motion, the Court must construe the complaint in the light most favorable to the plaintiff, read the complaint as a whole, and take the facts asserted therein as true. *Mylan Labs., Inc. v. Matkari,* 7 F.3d 1130, 1134 (4th Cir.1993). However, a court is not limited to the four corners of the complaint. A court may consider any document that is explicitly relied upon in the complaint. *In re Burlington Coat Factory Sec. Lit.,* 114 F.3d 1410 (3d Cir.1997); *Gasner v. County of Dinwiddie,* 162 F.R.D. 280 (E.D.Va.1995). A court can also consider the text of an undisputedly authentic document that is integral to the plaintiff's claim, even if the document is not attached or named in the complaint. *Id.* Conclusory allegations regarding the legal effect of the facts alleged need not be accepted. *See Labram v. Havel,* 43 F.3d 918, 921 (4th Cir.1995). Because the cen-

tral purpose of the complaint is to provide the defendant "fair notice of what the plaintiff's claim is and the grounds upon which it rests," the plaintiff's legal allegations must be supported by some factual basis sufficient to allow the defendants to prepare a fair response. *Conley*, 355 U.S. at 47, 78 S.Ct. 99.

This initial standard sets out how the Court construes the Complaint. The follow-on sections provide the substance in analyzing a 12(b)(6) motion. The substantive pleading standards are set forth in Section 10(b) of the Securities Exchange Act of 1934, Rule 10b–5, and the Private Securities Litigation Reform Act.

### 2. Section 10(b) of the Securities Exchange Act of 1934 & Federal Rule of Civil Procedure 9(b)

■ To establish liability under Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b), and under Rule 10b–5, 17 C.F.R. § 240.10b–5, a plaintiff must allege that "(1) in connection with a purchase or sale of securities, (2) the defendant made a false statement or omission of material fact (3) with scienter (4) upon which the plaintiff justifiably relied (5) that proximately caused the plaintiff damages." *Phillips v. LCI Int'l, Inc.*, 190 F.3d 609, 613 (4th Cir.1999). *See* 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b–5. Plaintiffs allege both securities fraud and fraud on the market;

thus, the Court analyzes Plaintiffs' claims under a "face to face"[1] standard and a "fraud on the market"[2] standard.

■ To state a valid claim for securities fraud resulting from a face to face transaction, the plaintiff must allege all five elements discussed in *Phillips*. When proceeding under a fraud on market theory, the plaintiff need not plead direct reliance or that the fraudulent practice was in connection with a particular sale or purchase of securities. Instead, the plaintiff need only show the means of dissemination and the materiality of the misrepresentation. *SEC v. Texas Gulf Sulphur Co.*, 401 F.2d 833 (2d Cir.1968); *Miller v. Asensio*, 101 F.Supp.2d 395 (D.S.C.2000).

In addition to meeting the requirements under Section 10(b), a plaintiff must also meet the requirements of Rule 9(b) of the Federal Rules of Civil Procedure that "the circumstance constituting fraud ... be stated with particularity" in the complaint. Section 10(b) provides the elements that the plaintiff will have to prove in order to succeed on his claim. Rule 9(b) provides the standard for pleading a fraud case; furthermore, Congress has codified the pleading standard that a plaintiff must meet in a securities fraud action in order to survive a 12(b)(6) motion to dismiss—the Private Securities Litigation Reform Act.

1. "Face to face" transactions include those involving negotiations between two parties, e.g., "the sale of a business, the private placement of securities, or a stockbroker's advice and recommendations." Donald C. Langevoort, Half–Truths: Protecting Mistaken Inferences by Investors and Others, 52 Stan. L.Rev. 87, 101 (1999).

2. "Fraud on the market" transactions typically include those transactions involving publicly disseminated information which is false and on which investors rely to make their investment decisions, e.g., corporate filings

with the SEC, press releases. *See* Langervoort, *supra* note 1, at 102. As stated by the Supreme Court:

> The "fraud on the market" theory is based on the hypothesis that, in an open and developed securities market, the price of a company's stock is determined by the available material information regarding the company and its business.... Misleading statements will therefore defraud purchasers of stock even if the purchasers do not directly rely on the misstatements.

*Basic v. Levinson*, 485 U.S. 224, 241–42, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988).

### 3. The Private Securities Litigation Reform Act (PSLRA)

■ The PSLRA codifies the requirements of Rule 9(b) and further requires that the complaint "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omissions is made on information and belief, ... state with particularity all the facts on which that belief is formed." 15 U.S.C. § 78u–4(b). The PSLRA also requires that the complaint in a securities fraud case "state with particularity facts giving rise to a strong inference that defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2). A complaint that fails to comply with these requirements must be dismissed on defendant's motion. See 15 U.S.C. § 78u–4(b)(3)(A).

■ The Fourth Circuit has not adopted a standard as to what a "strong inference" means within the PSLRA; however, the issue is not one of first impression within this Circuit. In MicroStrategy, Judge Ellis concluded that in reviewing whether a plaintiff has pled a "strong inference that the defendant acted with the requisite state of mind," a court must (1) take the factual allegations in the complaint as true, (2) draw whatever inferences regarding the defendant's state of mind are supported by these allegations, and (3) determine whether these inferences individually or cumulatively provide a strong—or persuasive and cogent—inference that the defendant possessed the requisite state of mind." In re MicroStrategy, Inc., Sec. Litig., 115 F.Supp.2d 620, 627 (E.D.Va. 2000). Judge Ellis added that "[i]f the totality of the circumstances alleged raises a strong inference of the requisite state of mind, it is immaterial whether plaintiffs satisfy their burden by pleading motive and opportunity, conscious misbehavior, recklessness, or by impressing upon the

Court a novel legal theory." Id. Hence, the plaintiff need not plead "motive and opportunity," "conscious misbehavior," or recklessness as long as the totality of the circumstances raise a strong inference of scienter.

The Fourth Circuit has held that the required state of mind, or scienter, for securities fraud liability is recklessness. Recklessness must be based on "an act so highly unreasonable and such an extreme departure from the standard of ordinary care as to present a danger of misleading the plaintiff to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." Phillips, 190 F.3d at 621. Accord In re MicroStrategy 115 F.Supp.2d at 633; Arnlund v. Deloitte & Touche LLP, 199 F.Supp.2d 461, 474 (E.D.Va. 2002).

### B. The Federal Securities Claims—Counts I and II

#### 1. Plaintiffs' Claims Are Barred by the Statute of Limitations

■ At the time the Plaintiffs began their action before this Court, March 6, 2002, the statute of limitations applicable to their federal securities claims barred all actions if they were filed more than one year after the discovery of the facts constituting the violation. Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson, 501 U.S. 350, 364, 111 S.Ct. 2773, 115 L.Ed.2d 321 (1991). This limitation period began running when Plaintiffs acquired inquiry notice of the alleged fraud. 15 U.S.C. § 78j(b); Brumbaugh v. Princeton Partners, 985 F.2d 157 (4th Cir.1993).

Defendants contend that Mr. Glaser had informed the Bankruptcy Court in the Eastern District of Virginia that he knew about the alleged fraud no later than January 2001. On or about January 19, 2001, Mr. Glaser filed for bankruptcy. On or

about February 7, 2001, Mr. Glaser filed a Federal Rule of Bankruptcy 2004 motion seeking examinations of Enzo and other parties; the Bankruptcy Court granted the motion. Mr. Glaser proceeded to conduct discovery, for nearly one year, before filing a complaint in this Court on March 6, 2002 (CA 02–327–A). From Mr. Glaser's own admissions before the Bankruptcy Court and his multiple complaints filed with this Court, the Court finds that Plaintiffs had inquiry notice of a federal securities fraud claim against Enzo no later than February 7, 2001, when Plaintiffs sought the discovery order from the Bankruptcy Court. *See Brumbaugh,* 985 F.2d at 162 ("Inquiry notice is triggered by evidence of the possibility of fraud, not by complete exposure of the alleged scam. Merely bringing suit after the scheme has been laid bare ... will not satisfy the requirements of due diligence when there have been prior warnings that something was amiss."). Plaintiffs obtained discovery from the Bankruptcy Court, protracted their filings for more than one year, and circumvented the provisions of the Private Securities Litigation Reform Act. Plaintiffs admit in their Amended Complaint that they had suspicion of securities fraud before seeking discovery from the Bankruptcy Court. (Amended Compl. ¶ 125.) The Court finds that there is no issue that needs to be left to the trier of fact because Plaintiffs were admittedly on inquiry notice of the alleged fraud more than one year before they filed their claim. The Court concludes that Plaintiffs's federal securities claims are barred by the one-year statute of limitations because Plaintiffs had inquiry notice on or about February 7, 2001, and did not file their first complaint until March 6, 2002.

■ Plaintiffs contend that the two-year limitations period established by Section 804 of the Sarbanes–Oxley Act of 2002 applies to this case. That section provides that:

a private right of action that involves a claim of fraud, deceit, manipulation, or contrivance in contravention of a regulatory requirement concerning the securities laws ... may be brought not later than the earlier of (1) 2 years after the discovery or the facts constituting the violation, or (2) 5 years after such violation.

28 U.S.C. § 1658(b). The Historical and Statutory Notes provide that this "limitations period ... shall apply to all proceedings addressed by this section that are commenced on or after the date of enactment of this Act [July 30, 2002]." *Id.* Plaintiffs contend that, although they have filed two complaints with this Court—one on March 6, 2002, the other on August 22, 2002, this Court should conclude that the Sarbanes–Oxley Act revived their federal securities fraud claim. Defendants contend that the Sarbanes–Oxley Act did not revive Plaintiffs cause of action because it had already become time-barred under the previous one-year limitations period.

■ While Congress may enlarge a limitations period, Congress' acts do not revive a cause of action that has become time-barred unless Congress specifically provides for retroactive application. *See Hughes Aircraft Co. v. United States,* 520 U.S. 939, 950, 117 S.Ct. 1871, 138 L.Ed.2d 135 (1997) ("extending a statute of limitations after the pre-existing period of limitations has expired impermissibly revives a moribund cause of action ... a newly enacted statute of limitations that lengthens the applicable statute of limitations may not be applied retroactively to revive a plaintiff's claim that was otherwise barred under the old statutory scheme"); *INS v. St. Cyr,* 533 U.S. 289, 317, 316, 121 S.Ct. 2271, 150 L.Ed.2d 347 (2001) ("a statement that a statute will become effective on a certain date does not even arguably support that it has any application to conduct

that occurred at an earlier date") (stating that while Congress has the power to enact laws with retroactive effects, it must clearly and unambiguously state that the law applies retroactively).

▮ The Court holds that Congress did not unambiguously provide that the two-year limitations period would apply retroactively. Furthermore, the Court has already concluded that Plaintiffs claims were barred under the previous one-year limitations period, and the presumption against retroactive application of the two-year limitations period favors the Defendants. Congress's provision that the statute of limitations would apply to all proceedings commenced on or after July 30, 2002, applies only to actions that may have accrued but that were not time-barred under the previous one-year limitations period. The Court holds that Congress did not specifically intend, with the Sarbanes–Oxley Act, to revive moribund actions such as the Plaintiffs'. Thus, the two-year limitations period established by the Sarbanes–Oxley Act does not apply retroactively to Plaintiffs' time-barred claims. The Court, therefore, dismisses Plaintiffs' federal securities claims as to all Defendants.

### 2. *Pleading with Specificity and Materiality*

▮ Courts have employed a statement-by-statement analysis in evaluating whether the complaint "specif[ies] each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omissions is made on information and belief, . . . state with particularity all the facts on which that belief is formed." 15 U.S.C. § 78u–4(b). *See Arnlund v. Smith*, 210 F.Supp.2d 755, 762–63 (E.D.Va.2002); *In re The First Union Corp. Sec. Litig.*, 128 F.Supp.2d 871, 889 (W.D.N.C.2001). The complaint must plead with particularity the time, place, speaker, and contents of the allegedly false statements. *Borow v. nVIEW Corp.*, 829 F.Supp. 828, 833 (E.D.Va.1993).

▮ Furthermore, a complaint alleging fraud may not group the defendants together: Rule 9(b) requires that allegations of fraud need to be pled with specificity. Fed.R.Civ.P. 9(b). This specificity requires that "at a minimum" for each alleged misstatement or omission,

> plaintiffs must plead specific facts concerning, for example, when *each* defendant or other corporate officer learned that a statement was false, how *that* defendant learned that the statement was false, and *the particular* document or other source of information from which the defendant came to know that the statement was false.

*In re First Union Corp. Sec. Litig.*, 128 F Supp.2d at 886. Group pleading fails to satisfy the requirement that the who, what, where, why, and when of the fraud be specified. *See id.*

As to materiality, the Fourth Circuit has defined a fact as material "if there is a substantial likelihood that a reasonable [investor] (1) would consider the fact important in deciding whether to buy or sell the security or (2) would have viewed the total mix of information made available to be significantly altered by disclosure of the fact." *Longman v. Food Lion, Inc.*, 197 F.3d 675, 682–83 (4th Cir.1999). However, the determination of materiality is a mixed question of law and fact; and the standard for a motion to dismiss is whether "no reasonable juror could determine that the alleged statements would have assumed actual significance in the deliberations of the reasonable investor." *In re MicroStrategy*, 115 F.Supp.2d at 657 (quoting *Press v. Chemical Inv. Servs. Corp.*, 166 F.3d 529, 538 (2d Cir.1999)).

#### a. *Enzo Biochem Activities in 1999*

 Plaintiffs allege that, in 1999, Enzo and the Individual Defendants had begun to plan the first of two "pump and dump" schemes. (Am.Compl.¶¶ 31–38.) The purpose of the "pump and dump" was to artificially raise the price of Enzo stock "for the sole purpose of permitting [the Individual Defendants] to dump some of their holdings at highly inflated prices," and "to provide trading opportunities to allow individuals to benefit through the pump and dump by purchasing and selling shares in the open market or short the stock." (*Id.* ¶ 31.) The only allegation of fraud that falls in this section of the Amended Complaint is Dr. Engelhardt's statement, at the 1999 annual shareholders' meeting, allegedly referring to the success of the Phase I trial of Enzo's HIV/AIDS protocol: "[i]t's all over, but the shouting." (*Id.* ¶ 33.) Plaintiffs allege that this statement was false because "there was no increase in the T cell count or decrease in the viral load" so that it was anything but "all over, but the shouting." (*Id.*)

The Court finds that this allegation is pled with enough specificity because Plaintiffs provide the reasons the statement is false and state with particularity the facts underlying the misrepresentation. The statement, however, is not material as a matter of law. While it is true that a "guarantee" of approval of a product by a federal agency might be actionable, actionable statements are worded as guarantees. *See Raab v. General Physics Corp.*, 4 F.3d 286, 290 (4th Cir.1993) ("'The market gives the most credence to those predictions supported by specific statements of fact, and those statements are, of course, actionable if false or misleading. However, 'projections of future performance not worded as guarantees are generally not actionable under the federal securities laws.'") (citing *Krim v. BancTexas Group,*

*Inc.*, 989 F.2d 1435, 1446 (5th Cir.1993)). In addition, when determining the materiality of an allegation, the Court must consider the allegation as it relates to the "total mix" of information available to the plaintiff at the time. *Phillips*, 190 F.3d at 615 (citing *Basic v. Levinson*, 485 U.S. 224, 231–32, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988)). Plaintiffs admit they knew that the purpose of the Phase I clinical trials was solely to determine safety, toxicity and pharmacokinetic properties and not the efficacy of the drug. (Am.Compl., Ex. 3.) Furthermore, no reasonable investor would rely on this statement, and the statement is not specific enough to perpetrate a fraud on the market. *See Raab*, 4 F.3d at 290. "Analysts and arbitrageurs rely on facts in determining the value of a security, not mere expressions of optimism from company spokesmen[;] ... [t]he market gives the most credence to those predictions supported by specific statements of fact ...." *Id.* The statement at issue here is a "puffing" statement expressing enthusiasm about the prospects of the HIV/AIDS protocol. Therefore, the Court finds that Dr. Engelhardt's statement that "[i]t's all over, but the shouting" is not material as a matter of law.

#### b. *False Statements to Brokers*

 In this portion of the Amended Complaint, Plaintiffs allege that, as part of the conspiracy to pump the Enzo stock, Defendants Weiner and Gross disseminated non-public information about the company's prospects to various brokers. (*Id.* ¶¶ 39–43.) Mr. Gross allegedly told an investment adviser named Robert Jernigan in 1999:(1) that "a major diagnostic deal with a European company was expected in much less than one year" (*id.* ¶ 41); (2) that "the progress in Enzo's therapeutics was 'enormous'" (*id.*); (3) that "[Enzo's] stealth vector [was] achieving transduction in cells from 50–90% with

an average of 80%, while normally transduction in cells is from 3/4 to 1%" (*id.*); (4) that "[Enzo] expected a patent to issue in 18–24 months" (*id.*); (5) that "clinicians were 'thrilled' with the results that had been obtained in Phase I and they were going to begin Phase II while Phase I was continued" (*id.*); (6) that "the HIV therapeutics were 'working, working, working—doing great'" (*id.*); and (7) that "clinicals were going well, but [Enzo was] seeing so many unusual happenings [that] must be reported to the FDA—all good happenings, no bad" (*id.*). Although Plaintiffs provide great detail as to the communications themselves, they fail to allege how these statements were false or misleading when made. The Court finds that these allegations do not satisfy the pleading requirements of the PSLRA.

Plaintiffs also allege that Defendants Weiner and Gross disseminated non-public information to a broker named Doug Yates and that Mr. Yates passed this information along to Plaintiffs' broker Ed Stephen. (*Id.* ¶ 42.) Plaintiffs, however, fail to provide, beyond their conclusory statements, the details of these communications and how these communications are false. The Court finds that this statement is not pled with the requisite specificity.

■ Plaintiffs allege that a person named Keating was also disseminating information about Enzo and its products. (*Id.* ¶ 43.) Plaintiffs maintain that Keating was a paid consultant to Enzo. (*Id.*) Plaintiffs, however, fail to provide how Keating's statements can be attributed to Enzo; furthermore, Keating is not a party to this case. The Court finds that Keating's statements are not pled with the requisite specificity.

Concerning the statements Defendants, and others, made to various brokers, the Court finds that the allegations are not pled with the requisite specificity: Plaintiffs fail to provide an explanation of how

these statements were false or misleading and how these individuals' statements are attributable to Enzo. The Court dismisses the Amended Complaint as to these allegations.

c. *The January 2000 Shareholders' Meeting*

Plaintiffs allege that, at the January 2000 annual shareholders' meeting, Defendants issued multiple misleading statements of material fact concerning Enzo's HIV protocol and its prospects. (*Id.* ¶¶ 44–70.) Plaintiffs maintain that, at the meeting, the company reported that "its therapeutic division had made significant progress in several areas" (*id.* ¶ 46) and that "it was strongly poised to benefit from new, exciting trends in drug development, and the diagnosis and treatment of disease" (*id.*). Plaintiffs fail to provide how these statements were false; furthermore, the Court finds that these statements are mere "puffery" describing Enzo's predictions about the future, are not material, and are not actionable as a matter of law. See *Raab*, 4 F.3d at 289–90.

Plaintiffs further allege that the Defendants made several statements regarding the progress of Enzo's HIV protocol. Mr. Weiner said that Enzo's Phase I clinical trial was proceeding satisfactorily and on schedule. (*Id.* ¶ 47.) Dr. Engelhardt stated that "it works, they both work," as he was referring to Enzo's HIV protocol and Enzo's gene therapy treatment for Hepatitis–B. (*Id.* ¶ 48.) Dr. Engelhardt also compared Enzo's HIV protocol to a "roach motel" where the virus goes in but does not come out. (*Id.* ¶ 49.) Dr. Engelhardt also stated that the "FDA will not let them say that they cured AIDS, but they have killed the virus." (*Id.*)

The Court finds that the falsity of Mr. Weiner's general statement as to the Phase I progress is not pled with specifici-

ty: Plaintiffs fail to explain how the statement was false. Although the statement reflects an opinion concerning current facts which may be material under *Virginia Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 111 S.Ct. 2749, 115 L.Ed.2d 929 (1991), Plaintiffs fail to state how the statement was based on false assumptions. *Raab*, 4 F.3d at 290. This statement fails to comport with the requirements of Rule 9(b). Furthermore, generalized positive statements about a company's progress are not a basis for liability. *Nathenson v. Zonagen, Inc.*, 267 F.3d 400, 419 (5th Cir. 2001).

The Court finds, however, that Dr. Engelhardt's specific statements as to the efficacy of the HIV protocol are pled with specificity: Plaintiffs allege these statements were false because "[a]s it relates to efficacy, the standard FDA markers of efficacy are that the T-cell counts increase and viral loads decrease." (Am. Compl.¶ 48.) However, even if pled with specificity, the statements are not actionable as a matter of law. When determining the materiality of an allegation, the Court must consider the allegation as it relates to the "total mix" of information available to the plaintiff at the time. *Phillips*, 190 F.3d at 615 (citing *Basic*, 485 U.S. at 231–32, 108 S.Ct. 978). The "total mix" of information includes publicly available information. *Id.* at 615, 617. As in *Phillips*, Plaintiffs here rest their Amended Complaint "on mischaracterizations of the public record, exaggeration of [statements], and isolation of [those] statement[s] from [their] context and from the wealth of information publicly available when [they] were made." 4 F.3d at 615.

In its 1999 Form 10K, Enzo detailed the purposes of the three phases of clinical trials.[3] Thus, Plaintiffs knew, or are charged with the knowledge, that the Phase I trials did not test the efficacy of the protocol, but merely tested whether the drug was safe in order to proceed to Phase II. "Although measuring cell count and viral load was part of the safety trial, those measurements were for safety monitoring purposes only—just as taking a complete blood count, height, weight, pulse and blood pressure were regularly performed for safety monitoring purposes." (Defs.' Mem. Opp'n at 12.) Thus, considering the "total mix" of information available to investors, Dr. Engelhardt's comments are just enthusiastic statements about the prospects of Enzo's Phase I clinical trials. *See Raab*, 4 F.3d at 289–90; *supra* Part II.B.2.a.

 At the meeting, Defendant Weiner allegedly stated that Enzo would be opening three more clinics to treat HIV and AIDS patients by the end of fiscal year 2000. (*Id.* ¶ 50.) Plaintiffs maintain that this statement was false because Enzo did not have permission from the Food and Drug Administration ("FDA") to open such clinics and because "such permission had never been sought by Enzo and could not in any event be obtained within that short period of time". (*Id.*) In addition, Defendant Weiner allegedly stated that Enzo had submitted its Phase I data to the FDA and that the company was awaiting approval for Phase II. (*Id.* ¶ 51.) The Amended Complaint alleges that this statement was false because Enzo did not have Phase I data that it could submit to

---

**3.** "Phase I trials, concerned primarily with the *safety and preliminary effectiveness* of the drug, involve fewer than 100 subjects. Phase II trials normally involve a few hundred patients and are designed primarily to demonstrate *effectiveness* in treating or diagnosing the disease .... Phase III trials are expanded clinical trials with larger number of patients and are intended to gather the additional information for proper *dosage and labeling* of the drug. Clinical trials may take two to five years, but the period may vary." (Chase Decl. Ex. J., p. 10.)(Emphasis added)

the FDA for approval. (*Id.*) The Court finds that these allegations are pled with the specificity required under the PSLRA.

These statements, however, are not material and are not actionable as a matter of law. The statement as to Enzo's opening of three more clinics to treat HIV and AIDS patients by the end of fiscal year 2000 is a statement as to future events—a loose prediction as to the timing of the achievement. Plaintiffs even acknowledge in their own pleadings that the statement was a prediction. (Am.Compl.¶ 50.) They acknowledge the events that would have to take place in order for Enzo to be able to open up more clinics and to receive revenue from those clinics: Enzo needed FDA approval to open the clinics for revenue. (*Id.*) Furthermore, Plaintiffs admit that "in any event" such approval could not be obtained in such a short period of time. (*Id.*) Also, Enzo had disclosed, in its 1999 Form 10K, that the three phases of clinical trials could take two to five years. (Chase Decl., Ex. J., p. 10.) Thus, a reasonable investor would not rely on this statement, and the statement does not alter the "total mix" of information available to investors. *See Raab*, 4 F.3d at 290.

 The statement that Enzo had submitted its Phase I data to the FDA and that company was awaiting approval for Phase II is not material. In the same pleading, Plaintiffs acknowledge that Enzo had "only one patient [who] had been treated and the data from that patient was not confirming any of Enzo's pre-contemplated or any valued therapeutic markers." (Am.Compl.¶ 51.) Thus, Plaintiffs admit that Enzo had some data that it could submit to the FDA, even if it was data from only one patient. Furthermore, various company press releases confirm that Enzo was developing a Phase II protocol, but warned that Phase I was not complete. (Chase Decl., Exs. F & G.). Therefore, considering the totality of the information

available to investors, this statement is not material.

At the shareholders' meeting, Mr. Weiner made several statements concerning Enzo's HGTV–43 vector for delivering genes to human cells, a process called transduction. (*Id.* ¶¶ 52–58.) Mr. Weiner stated that "Enzo scientists had been able to substantially reduce the time period required for successful transduction to 18 hours, as compared to previous transduction times of up to three months." (*Id.* ¶ 53.) Mr. Weiner also stated that the gene transfer vector was able to achieve levels of stable transduction to the patients' non-growing blood stem cells greater than 30%. (*Id.* ¶ 55.) He stated that the HGTV–43 vector was ready for commercialization. (*Id.* ¶ 56.) Also, in a press release, Enzo stated that it was exploring expansion of its trials. (*Id.*) Furthermore, at the shareholders' meeting and in previous press releases, Enzo (individual unspecified) made reference to its "universal, patented, and ready to be commercialized vector of choice." (*Id.* ¶ 57.) Plaintiffs allege that these statements were false when made because: (1) Mr. Weiner omitted that the absence of any positive data from previous patients had caused Enzo to directly modify the protocol (*id.* ¶ 53); (2) Mr. Weiner omitted that "the data had been negative and had put the trials behind in terms of the period of time that had transpired from the FDA approval to commence the trials—July 13, 1998—to the issuance of Mr. Weiner's statement" (*id.* ¶ 54); (3) the HGTV–43 vector has not been commercialized (*id.* ¶ 56); (4) the HIV protocol trials have not expanded nor has any written protocol been presented to expand the HIV trials (*id.*); and (5) Enzo was using Lipofectin, a system not owned by Enzo, to transduce its antisense genes (*id.* ¶¶ 57–58). The Court finds that these allegations are pled with the required specificity under the PSLRA.

However, neither Mr. Weiner's statements regarding the HGTV–43 vector nor Enzo's press release are material statements actionable under the federal securities laws. In these allegations, Plaintiffs assume that Enzo, and more specifically Defendant Weiner, had a duty to speak as to every aspect of the FDA clinical trials. "In order for there to be liability under 10b–5 for omissions or nondisclosure ... a duty to speak must exist." *Walker v. Action Industries,* 802 F.2d 703, 706 (4th Cir.1986), *cert. denied,* 479 U.S. 1065, 107 S.Ct. 952, 93 L.Ed.2d 1000 (1987). Such a duty generally arises when omitting particular facts makes some existing statement misleading. *See* 17 C.F.R. § 240.10b–5. Concerning the allegation that Enzo had reduced its transduction time to 18 hours, Plaintiffs themselves admit that "Enzo ... had decided that 18 hours of transduction was all the cells could tolerate of the originally 'months long' process of transduction and growth." (Am.Compl.¶ 53.) Thus, the statement is immaterial because Defendant Weiner's comments had a factual basis which was not false. Plaintiffs make other allegations concerning Enzo's HGTV–43 vector; however, the Plaintiffs choose to turn a blind a eye to the publicly available information. Contemporaneous with the annual shareholders' meeting, Enzo issued documents indicating that the HIV/AIDS protocol remained in the Phase I trial: (1) the 1999 Form 10K (describing the Phase I clinical trial process and the duration of the three phases of clinical trials); (2) a January 12, 2000 press release (cautioning that the Phase I trial was not yet completed and "that further evaluation of treated individuals and treatment of additional patients was needed to fully document efficacy") (Chase Decl., Ex. F). Thus, no reasonable investor would rely solely on these statements in light of other information indicating that the protocol remained in Phase I and that Phase I was focused on determining the safety of the protocol. Regarding the commercialization of Enzo's HGTV–43 vector, those statements are projections of future events and are expressions of optimism about the potential of commercializing the HGTV–43 vector. Plaintiff allege that the statements about HGTV–43's potential for commercialization are false because they have not been commercialized. However, as discussed previously, the statements referred to HGTV–43 *being ready* for commercialization: this is optimism, not actionable as a matter of law.

Plaintiffs allege that Mr. Weiner discussed the possibility that Phase II and Phase III would be fast-tracked on the basis of compassionate use. (*Id.* ¶ 59.) Plaintiffs contend that this statement was false because "Weiner had no basis whatsoever to make such a statement, which was not only false, but irresponsible." (*Id.*) The Court finds that Plaintiffs fail to plead this statement with the required specificity because conclusory statements as to the effect of a particular fact will not support allegations of fraud. Furthermore, these statements are predictions of future events: Mr. Weiner discussed the *possibility* of fast-tracking. The statement is an opinion about the course Enzo may follow if approved by the FDA, not a guarantee that the protocol would be fast-tracked. A reasonable investor would not rely on this statement, and it is immaterial. *See Raab,* 4 F.3d at 290.

### d. *Preparations for the Second Dump*

In this section of the Amended Complaint, Plaintiffs allege that the Defendants engaged in disseminating false information to the public to pump up the price of the Enzo stock for a second dump. (Am. Compl.¶¶ 77–91.) Allegedly in response to a stock market downturn, Enzo issued a press release stating that the company had a "solid and uniquely strong scientific posi-

tion" and that Enzo was in a position "to play a key role in the rapidly advancing field of biotechnology as this millennium gets underway." (*Id.* ¶ 78.) The press release also stated that: (1) the clinical study at the University of California for HIV–1 infected patients was "moving towards its final stages;" (2) HGTV–43 has "successfully delivered—and continues to deliver—antisense genes effectively and quickly to blood stem cells outside the human body;" (3) following transduction and infusion into the patients, "the genetically engineered cells continue to survive in circulation and continue to produce antisense RNA over many months;" (4) an abstract would be presented at the American Society of Gene Therapy in June; (5) Enzo did not know of any other system that had achieved "these levels in unablated adult patients" (patients in which the blood cells have not been destroyed); (6) plans for Phase II clinical studies are now proceeding. (*Id.* ¶ 79.)

Plaintiffs allege that these statements are false because "Enzo's trials had not produced promising results, and as to the HIV trials, [the trials] had actually produced very negative results." (*Id.* ¶ 81.) Enzo had not filed for Phase II approval, during which efficacy is studied. (*Id.* ¶ 82.) "Enzo never had any attributable efficacy to report at any time with its [HIV] protocol and University of California at San Francisco trials and did not have any attributable efficacy to study as a result of its Phase I effort." (*Id.*) Plaintiffs allege that Enzo omitted that the data collected was based on five patients (*id.* ¶ 84); furthermore, Enzo did not have a schedule in place for its testing (*id.*). The Court finds that the above-cited statements are pled with the required specificity.

The statements discussed above, however, are not material within the confines of the securities laws because all of the state-ments, except (2) and (3), are "puffery." The Fourth Circuit has explained that "soft, puffing statements generally lack materiality because the market price of a share is not inflated by vague statements predicting growth." *Hillson Partners L.P. v. Adage, Inc.,* 42 F.3d 204, 211 (4th Cir.1994). Concerning Enzo's statements that it was poised to succeed and to play a key role in the market, the Court finds that the statements are a mere series of sales pitches and can be squarely classified as "puffery." Statements (1), (4), (5) and (6) are mere expressions of hope regarding the future of Enzo and its HIV protocol. For example, "the study at the University of California was moving towards its final stages." (Am.Compl.¶ 82.) Nothing in the language evinces a guarantee of a final product; the statement merely reflected that Enzo believed that the study was progressing. See also statement (4) ("an abstract would be presented") and statement (6) ("plans . . . are now proceeding"). These statements are worded in indefinite and non-committal language, and they are not actionable under the securities laws.

As to statements (2) and (3), Plaintiffs offer that Enzo had little or no efficacy data to report or to study and that the data was based on only five patients. Plaintiffs, once again, seek to second guess the decisions of the company, and they interject their own theories of science and bioengineering to masquerade their own misunderstanding of the clinical trial process. As previously stated on several occasions in this Memorandum Opinion, the goal of the Phase I clinical process was to determine the safety and preliminary effectiveness of the drug—not the overall efficacy of the drug. In their own pleadings, Plaintiffs admit that Phase II was when Enzo would study the actual efficacy of the drug. (Am.Compl.¶ 82.) In addition, Plaintiffs confuse the effectiveness of Enzo's gene delivery platform with the

efficacy of the drug in treating HIV, that is, increasing the T-cell count and decreasing the viral load. Plaintiffs assume, at their convenience, that the Phase I trials were established to demonstrate effectiveness in treating HIV; however, they undeniably admit that in its Phase I trials, Enzo was focused on determining safety and in *measuring* and *monitoring* the T-cell count and viral load. (*Id.* ¶¶ 4–5.) Thus, Plaintiffs seek to impose liability on Enzo and the Individual Defendants on completely inapposite grounds; this they may not do successfully. The record before the Court, however, is clear; and, the minutes of the Recombinant Advisory Committee ("RAC") meeting reveal that the HGTV–43 vector successfully engrafted Enzo-engineered cells: "these data support the conclusion that stable engraftment of some of the antisense RNA-producing PBSC has occurred." (Chase Decl., Ex. O, p. 3.) Therefore, statements (2) and (3) are immaterial because the statements were based on actual verifiable facts.

Plaintiffs also allege that Enzo misstated its patent estate by stating that it had been awarded over 200 patents worldwide. Enzo has 36 patents issued by the United States Patent and Trademark Office; the remaining patents are, allegedly, the same patents issued in other countries. (*Id.* ¶ 80, 90–91.) The Court finds that this allegation does not meet the pleading requirements of the PSLRA because the allegation that Enzo owned only 36 U.S. patents and that the remaining patents were issued in other countries does not show that Enzo did not own "approximately 200 *worldwide* patents." (Emphasis added). The allegation fails to set forth how Enzo's valuation of its patent estate was false.

■■■ Plaintiffs allege that after the market price of the stock collapsed to $35, "Enzo issued a press release stating that it

had no explanation for the collapse in the price of the stock, all remained well with Enzo, and the human trials currently being conducted were on schedule." (*Id.* ¶ 85.) Plaintiffs allege that this press release was materially false because "Enzo knew that the transfer of the 600,000 shares *that had not been publicly released* was a negative as it demonstrated a lack of confidence by top management." (*Id.*) The press release, allegedly, also omitted to state that Enzo had no schedule regarding the trials. (*Id.*) The Court finds that this allegation satisfies the pleading requirements under the PSLRA. The allegations, however, are not material as a matter of law because mere allegations of "fraud by hindsight" will not satisfy the requirements of the PSLRA. *In re Criimi Mae, Inc., Sec. Litig.,* 94 F.Supp.2d 652, 662 (D.Md.2000) (quoting, in part, *Hillson Partners L.P.,* 42 F.3d at 209). In addition, the allegations fail to meet the requirements of Rule 10b–5 as to materiality in fraud on the market cases because the information had not been publicly released; therefore, this allegation is not actionable.

At the RAC meeting of March 8, 2001, Enzo's data from the Phase I trial of its HIV protocol was reviewed. (*Id.* ¶ 86.) Plaintiffs allege that the data did not support the "picture" that Enzo had painted for the investment community. (*Id.* ¶¶ 86–89.) Plaintiffs use these allegations to support their argument that Enzo knew that the Phase I trials were not proceeding according to plan and that Enzo should have disclosed their progress to the public. As explained in *In re Medimmune, Inc., Securities Litigation,* questioning by the FDA does not impose a duty upon the Defendants to disclose every aspect of the review or of the dialogue between the company and the FDA. 873 F.Supp. 953, 966 (D.Md.1995). That court wrote:

Mere questioning by the FDA imposed no duty upon Defendants either to trim

back their opinions as to the efficacy of the drug or to report to the public the FDA staffers' questions as they arose. Continuous dialogue between the FDA and the proponent of a new drug is the essence of the product license application process. Questions may emanate from one or more staffers in random and sporadic fashion. Many, if not all, questions presumably get answered in the process. Requiring ongoing disclosure of FDA's questions would not only be disruptive to the review process; it could easily result in misleading the public more than not reporting the questions. Where mere disclosure of a question might cause the company's stock to decline in value, the eventual answer to the question might cause it to rise once again.

*Id.* The Court finds that Defendants had no duty to report its ongoing discussions with the FDA during the review process. Furthermore, a reasonable investor had enough information to understand that the HIV protocol remained in its Phase I trial and that the purpose of the Phase I trial was to determine how safe the protocol was and to monitor and measure the protocol's effect on its target—not to determine whether the HIV protocol was effective against HIV, as Plaintiffs would have the Court believe. Therefore these statements are not actionable as a matter of law.

e. *Circulation of False Inside Information*

In this portion of the pleadings, Plaintiffs allege that Mr. Weiner and Mr. Gross provided misleading information about Enzo's prospects to certain brokers. (*Id.* ¶¶ 92–94.) Plaintiffs provide a list of the alleged misrepresentations (*id.* ¶ 93); however, they fail to provide any facts as to how these statements were false. Furthermore, Plaintiffs impermissibly group Mr. Weiner and Mr. Gross as they fail to attribute a specific statement to a specific Defendant. The Court finds that these allegations fail to meet the requisite specificity under the PSLRA or Rule 9(b) because they fail, simply, to set forth the reasons why the statements were false.

f. *The Planned Second Dump*

Plaintiffs contend that the Defendants engaged in a second "pump and dump" scheme whereby they disseminated false information to the public, sought to raise the price of the Enzo stock, and attempted sell their Enzo shares through a private placement. (*Id.* ¶¶ 95–115.) Plaintiffs allege that, as part of the scheme, Enzo provided false and inflated revenue estimates to an investment analyst who projected an initial price target of $111 per share. (*Id.* ¶ 103.) However, Plaintiffs fail to provide how the information was false; mere conclusory statements as to the effect of the facts will not suffice.

Plaintiffs assert that Defendant Hy Gross also participated in disseminating false information by telling investors that: (1) Enzo was planning to file, within 90 days, a series of patent infringement suits for certain patents issued in the United States and Japan; (2) UBS Warburg (an investment broker) was waiting to issue a report until September (year unknown) to allow certain "important customers to front-run the report and ... to wait until their European clients came back from their August vacation;" and (3) the initial report would be followed by a 30–page report distinguishing Enzo from other biotech companies. (*Id.* ¶ 104.) Mr. Gross allegedly also disseminated a claim that Enzo had cured liver cancer in humans. Plaintiffs, however, fail to provide any facts or an explanation as to how these statements were untrue. Also Plaintiffs fail to allege, with specificity, when and how these statements were disseminated,

how they impacted the market price of Enzo's shares, or whether Mr. Gross had any knowledge, or any reason to have knowledge, of the alleged falsity of the statements. *See Phillips*, 190 F.3d at 613; *Hillson Partners L.P.*, 42 F.3d at 208; *Arnlund*, 199 F.Supp.2d at 475. Plaintiffs' allegations fail to meet the heightened pleading standards of the PSLRA.

■ In addition to the previous statements, Plaintiffs allege that Mr. Gross told an Enzo shareholder that Mr. Gross had just purchased 40,000 shares of Enzo at a cost of $2 million. (*Id.* ¶ 105.) According to Plaintiffs, Mr. Gross subsequently admitted to another shareholder that he had not made the previous purchase, but merely made the statement about the purchase so that the other shareholder would not sell his shares. (*Id.*) Plaintiffs' allegations on this point satisfy the pleading requirements of the statute and will be further analyzed as to materiality and scienter.

Mr. Gross' statements, however, are not material because, as pleaded, the statements were not publicly disclosed and a reasonable investor, taking all publicly available information, would not have reasonably relied on such information. In determining whether a statement affects the total mix of information, the Court must consider whether the statement was made "in a manner reasonably calculated to influence the investing public, e.g., by means of the financial media, ... if such assertions are false or misleading or are so incomplete as to mislead irrespective of whether the issuance of the release was motivated by corporate officials for ulterior purposes." *Texas Gulf Sulphur Co.*, 401 F.2d at 862. Mr. Gross' statement to one shareholder about his alleged purchase of 40,000 Enzo shares fails to rise to the level of information "reasonably calculated to influence the investing public." The statement was confined to one shareholder. Furthermore, Plaintiffs fail to explain

how this one shareholder encompasses "the investing public;" the single shareholder could be one individual as well as one institutional investor. In addition to its limited release, the statement does not affect the "total mix" of information. Mr. Gross' statement is not the kind of information that a reasonable investor relies upon, such as financial statements, public filings, and press releases. This statement is not actionable as a matter of law.

■ Plaintiffs allege that Mr. Weiner "planted a false and misleading article in Business Week Online." (*Id.* ¶ 106.) Plaintiffs allege that the article stated that "there was an interest by major pharmaceuticals to do a joint venture with Enzo and there had been a buyout offer." (*Id.*) Plaintiffs contend that the statement was false because no buyout offer had ever been made. (*Id.*) Plaintiffs also allege that Mr. Weiner was quoted as saying that Enzo was the only company that had been able to obtain engraftment without ablation. (*Id.* ¶ 107.) Plaintiffs contend that the statement was false when issued because three months later, Enzo attempted to amend its protocol to include ablation as engraftment had failed. (*Id.*) Plaintiffs, however, fail to provide any specifics as to how Mr. Weiner controlled the context of the article, or the author's name or the date of issue. *See Raab*, 4 F.3d at 288 ("The securities laws require [defendants] to speak truthfully to investors; they do not require the company to police statements made by third parties for inaccuracies, even if third party attributes the statement to [defendants]").

Plaintiffs maintain that in a press release dated October 2, 2000, Enzo reported that "new data on the first individual treated in the Phase I clinical trial of HGTV–43, the company's HIV–1 gene medicine product, show that after nine and one-half months Enzo engineered cells have suc-

cessfully engrafted in the patient's bone marrow and were spawning new differentiated CD4+ cells designed to fight the virus." (*Id.* ¶ 108.) Plaintiffs contend that this statement was false when made because the data Enzo disclosed to the public on March 8, 2001, at the RAC, indicated that engraftment had actually failed. (*Id.* ¶ 109.) Furthermore, Plaintiffs provide other allegations describing scientific evidence that potentially contradicts the press release. (*Id.* ¶ 109–112.) When viewed together, these allegations satisfy the pleading requirements of the PSLRA.

These allegations, however, are not material as a matter of law. To explain the matter at issue in this statement, a vector is a platform for delivery of genes to stem cells. Engraftment is the successful delivery of those cells into a patient's bone marrow. Enzo's press release stated, simply, that the HGTV–43 medicine product had successfully delivered some of the Enzo engineered cells to the patient's bone marrow and that those cells were spawning cells designed to fight HIV. Plaintiffs contend that the statement is false because a later discussion before the RAC disclosed that the Enzo engineered cells that had engrafted had not been successful in fighting HIV, that the patient's viral loads had actually increased, that Enzo placed the patients on HAART, a standard HIV+ drug based therapy, and that the original protocol had been abandoned or substituted because of the introduction of HAART. Although at first blush Enzo's statements seem false and in contradiction of the true data, the statements correctly reflected the results up to that point. Plaintiffs continue to confuse the goals of Phases I and II in contradiction to the public record. At the RAC Committee meeting, Enzo stated that cells had engrafted, but that not enough cells had been engrafted to impact T-cells or the viral load. (Am. Compl., Ex. 6 at 65–66 (". . . the number of transduced CD34 cells

that we got to the bone marrow is so low and they continue to produce CD4 cells in that appropriate ratio that we are not seeing the numbers go up[;] . . . we need to get up to 10% transfected CD34 cells in the marrow making a significant number of CD4 cells in the peripheral circulation.").) Thus, in keeping with its Phase I goal, Enzo had, in fact, successfully engrafted some of its cells; however, these cells had not been successful in increasing the T-cell count or decreasing the viral load—a Phase II goal. The Court concludes that Plaintiffs mischaracterize the record. In light of the total mix of information and a basic understanding that the Phase I goal, as described in many publicly disclosed documents, was to test the safety of the protocol and measure and monitor the T-cell count and viral load, the Court concludes that the Enzo's statements in the October 2, 2000 press release are not actionable under the securities laws.

Plaintiffs assert that Dr. Engelhardt, in a press release, stated that "[t]his is a dramatic result, one that underscores, in the light of other achievements we have recorded in this trial, that our gene medicine and technology designed to counter the HIV virus in on the right track." (*Id.* ¶ 113.) Plaintiffs contend that this statement was false because Enzo's protocol had not proven to be effective in fighting the HIV agent. (*Id.*) The Court finds that these allegations meet the pleading standards set forth in the PSLRA. However, the statement is not actionable because it is merely inactionable puffery. *See Raab*, 4 F.3d at 290. Dr. Engelhardt's statement that the Enzo protocol is "on the right track" is a generalized positive statement about the progress of the protocol—it is not worded as a guarantee. The statement is immaterial.

### 3. Scienter and Conspiracy Theories

The PSLRA requires that the complaint in a securities fraud case "state with particularity facts giving rise to a strong inference that defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2). A complaint that fails to comply with these requirements must be dismissed on defendant's motion. *See* 15 U.S.C. § 78u–4(b)(3)(A). The ultimate determination for the Court under the scienter inquiry is whether, taking the totality of the circumstances as alleged in the complaint, the allegations support a "cogent and persuasive ... inference that a defendant acted intentionally, consciously, or recklessly." *In re MicroStrategy*, 115 F.Supp.2d at 633–34. A plaintiff may plead scienter by alleging either (1) motive and opportunity to commit fraud or (2) recklessness. *Phillips*, 190 F.3d at 621. A plaintiff may plead motive and opportunity by showing both that the defendant would receive "concrete benefits" by making the misrepresentation, and that the defendant had the "means and likely prospects of achieving" those benefits." *Id.* Recklessness is defined as a highly unreasonable act or an extreme departure from the standard of ordinary care where the defendant either knew of the danger of misleading the plaintiff or the danger was so obvious that the defendant must have been aware of it. *Phillips*, 190 F.3d at 621. In order to meet this high burden, Plaintiff must plead with particularity the facts creating a strong inference that *each of the Enzo Defendants* had the motive and opportunity to commit fraud or consciously or recklessly made material misstatements or failed to disclose material information. *In re Trex Co. Sec. Litig.*, 212 F.Supp.2d 596 (W.D.Va.2002). Plaintiffs, however, will not be permitted to proceed based on theories of aiding and abetting which are precluded by *Central Bank of Denver v. First Interstate Bank of Denver*, 511 U.S. 164, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994).

Plaintiffs proceed under a general theory that the Defendants conspired to pump the price of the stock, on two occasions, so that they could sell their stock at these elevated prices. The Defendants allegedly achieved this by disseminating several false statements, either at the 2000 annual shareholders' meeting or through press releases. Although as a general rule plaintiffs may not proceed under theories of aiding and abetting or conspiracy to violate Section 10(b) or Rule 10b–5, Plaintiffs may proceed under a conspiracy theory so long as they can show that each Defendant involved in the conspiracy would be primarily liable. *See In re Enron Corp. Sec., Derivative & ERISA Litig.*, 235 F.Supp.2d 549, 592 (S.D.Tex.2002).

#### a. Defendants John DeLucca, Elazar Rabbani and Shahram Rabbani,

Plaintiffs allege that John DeLucca, a member of Enzo's Board of Directors, sold all of his Enzo holdings when the Enzo stock price hit a 15–year high at approximately $81 per share. Plaintiffs contend that Mr. DeLucca is liable as a controlling person. Plaintiffs further allege that Elazar and Shahram Rabbani transferred or sold 400,000 shares of Enzo stock on March 28, 2000, at an inflated market value of over $48 million. (Compl.¶ 74.) They contend that the Rabbanis are liable as controlling persons because Elazar Rabbani was Enzo's Chief Executive Officer and Shahram Rabbani was Enzo's Chief Operating Officer. Plaintiffs, however, fail to provide any facts asserting primary liability as to Defendants DeLucca, Elazar Rabbani or Shahram Rabbani under Section 10(b). Specifically, Plaintiffs fail to allege how these Defendants perpetrated a fraud: how they misrepresented certain facts or

how they omitted material facts. The only allegations in the Amended Complaint as to these Defendants are that they sold their shares in a favorable market. The Court finds that Plaintiffs fail to establish primary liability as to Defendants DeLucca and the Rabbanis. *See Central Bank,* 511 U.S. at 176–77, 114 S.Ct. 1439; *Anixter v. Home–Stake Prod. Co.,* 77 F.3d 1215, 1226–27 (10th Cir.1996) (finding that section 10(b) requires an actual misrepresentation by the defendant for liability to attach). In *Central Bank,* the Supreme Court held that persons who do not actually make misrepresentations but only "give a degree of aid to those who do" are not liable for securities fraud. 511 U.S. at 176–77, 114 S.Ct. 1439. Absent additional allegations beyond those that these defendants sold shares of Enzo and that they were company officers, the Court concludes that Plaintiffs fail to state a federal securities violation claim for which relief may be granted as to Defendants John DeLucca, Elazar Rabbani and Shahram Rabbani. Accordingly, the Court does not consider Mr. Delucca's or Messrs. Rabbani's sales of Enzo stock in the overall determination of scienter.

b. *Defendants Barry Weiner, Dean Engelhardt and Heiman Gross*

Considering the allegations against the remaining Defendants, the Court finds that Plaintiffs fail to allege scienter with the requisite particularity as to Barry Weiner, Dean Engelhardt, or Heiman Gross. Plaintiffs allege that Defendants Weiner, Engelhardt and Gross "conspired" to pump up the price of the Enzo stock so that they could sell their own shares at artificially inflated prices. They allegedly achieved this by disseminating the various statements discussed in Part II.B.2., supra, generally: (1) the progress of the clinical trials for the HIV protocol, (2) the efficacy of the Enzo gene therapy, (3) Enzo's patent estate of over 200 worldwide patents, and (4) Enzo's undertaking of a major diagnostic transaction with a drug company in the near future. In addition, Plaintiffs allege that Dr. Engelhardt sold approximately $350,000 worth of stock in March 2000, and that Mr. Weiner sold or transferred 200,000 shares of Enzo stock on March 28, 2000 at a market value of over $48 million.

Plaintiffs' theory of scienter fails for several reasons. First, as discussed in Part II.B.2., *supra,* the Court determined that the Amended Complaint fails to adequately allege that Defendants' statements were either material or false, affirmatively or through omissions. Thus, Plaintiffs fail to adduce any direct or circumstantial evidence of reckless behavior on the part of the Defendants in making the alleged statements. *San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Cos.,* 75 F.3d 801, 813–14 (2d Cir. 1996). Second, the general motive of a corporation or its corporate officers to increase share price and to paint a favorable business picture of the corporation are not sufficient motives for fraud in these circumstances. *See In re Trex Co.,* 212 F.Supp.2d 596, 607 (W.D.Va.2002); *In re MicroStrategy,* 115 F.Supp.2d at 642–43. *See also Melder v. Morris,* 27 F.3d 1097, 1102 (5th Cir.1994) (holding that accepting motive of scienter that defendant corporate officers were motivated by incentive compensation "would effectively eliminate the state of mind requirement as to all corporate officers and defendants"). An inference based on a general motive shared by all corporate officers is not probative of scienter absent additional circumstances because "to find such allegations sufficient would unfairly infer an intent to defraud based on the position an individual held within a company." *In re MicroStrategy,* 115 F.Supp.2d at 642–43; *see also In re Criimi Mae, Inc. Sec. Litig.,* 94

F.Supp.2d at 659–663 (explaining how pleading scienter by making references to what the defendant corporate officers knew or recklessly disregarded is not sufficient where the allegations applied to any corporate officer). Therefore, Plaintiffs' theory that the Defendants acted with scienter because they were officers of the company fails as a matter of law in this instance.

Third, Plaintiffs' allegations that the insiders benefitted from the alleged sales and transfers of stock are not plead with the requisite specificity. Plaintiffs maintain that for the fifteen years preceding the alleged fraudulent scheme, the market price of Enzo common stock was less than $20 per share. (Am.Compl.¶ 10.) As a result of the dissemination of the fraudulent statements generated at the January 2000 shareholders' meeting, Plaintiffs allege, the price of Enzo stock increased from $44 to $139 per share within two weeks. (Id. ¶ 45.) They allege that on January 24, 2000, Enzo stock opened at $125, rose to $139, and closed at $78. (Id.) Plaintiffs then assert that Dr. Engelhardt subsequently sold approximately $350,000 worth of stock in March 2000 and that Mr. Weiner transferred 200,000 shares of Enzo stock on March 28, 2000. (Id. ¶¶ 73–74.) To establish a link between the timing of the sales by the Defendants and the alleged misrepresentations, Plaintiffs allege that the March 28 sale "occurred within a few days of the alleged promised openings of the clinics and the anticipated revenue stream." (Id. ¶ 76.) Within approximately two weeks of these sales, the market price of Enzo stock had dropped from $81 to $35 per share.

Although Plaintiffs provide some detail as to how the price of Enzo common stock fluctuated between 1998 and 2000, they fail to tie any alleged activity or wrongdoing by the Defendants to the actual price fluctuations. For example, Plaintiffs contend that Enzo stock opened on January 24, 2000, at $125, rose to $139, and closed at $78; this movement in the price, allegedly, was a result of the "false and misleading" statements that were made at the January 2000 annual shareholders' meeting. The next event in their scienter theory is that the Defendants sold or transferred some of their Enzo shares in March 2000. However, these two events, taken together, do not raise a strong inference of scienter.

 Generally, fraudulent intent is not inferred from the sale of stock by some officers of the corporation. *See In re Advanta Corp. Sec. Litig.*, 180 F.3d 525, 540 (3d Cir.1999); *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d at 1424; *San Leandro Emergency Med. Group*, 75 F.3d at 813–14; *Shaw v. Digital Equip. Corp.*, 82 F.3d 1194, 1224 (1st Cir.1996). "If the stock sales were unusual in scope or timing, they may support an inference of scienter." *In re Advanta*, 180 F.3d at 540. However, in this instance, Plaintiffs have not alleged with specificity how Mr. Weiner's or Dr. Engelhardt's sales were unusual in scope or in timing. The temporal link Plaintiffs allege is not sufficient, in and of itself, to raise a strong inference of fraudulent intent. For example, in *Burlington Coat Factory Securities Litigation*, the Court of Appeals for the Third Circuit found that the alleged insider stock sales did not raise a strong inference of scienter because:

> only three of the five defendants had sold stock, plaintiffs provided information on the total stock holdings of only one defendant who had traded only 0.5 percent of his holdings, and plaintiffs failed to plead facts indicating whether such trades were 'normal and routine' for the defendants and whether the trading profits were substantial in comparison to their overall compensation.

*In re Advanta,* 180 F.3d at 540 (summarizing the circumstances of the court's previous holding in *Burlington Coat Factory* ). Unlike the plaintiffs in *Burlington Coat Factory,* Plaintiffs here fail to provide *any* information on Mr. Weiner's or Dr. Engelhardt's overall Enzo stock holdings, or what percentage of their total holdings they had sold in March 2000, or whether these transactions constituted substantial profits in comparison to their overall compensation.[4] In addition, Plaintiffs failed to allege how Mr. Weiner's and Dr. Engelhardt's trades were abnormal or random. Plaintiffs allege that Defendant DeLucca sold all of his shares; however, Mr. DeLucca is not alleged to have made any misrepresentations or omissions. Thus, as stated previously, Mr. DeLucca's sales may not form a basis for scienter for the other Defendants. "To the extent plaintiffs choose to allege fraudulent behavior based on what they perceive as 'suspicious' trading activity, they have to allege facts that support that suspicion;"[5] this they have failed to do.

Fourth and last, the private placement agreement, allegedly part of the second "pump and dump" scheme, is irrelevant as to scienter because the parties did not carry out the agreement and because an insider sale, either public or private, would have to be disclosed in accordance with 15 U.S.C. § 78p. Thus, the statutes do not prohibit the Defendants from engaging in a private placement so long as the transaction meets the reporting and registration requirements set forth in the United States Code and the regulations promulgated therefrom. Selling through a private placement requires creating a document, such as a private placement memorandum, which, although confidential, clearly discloses the identity of those shareholders intending to sell, how much they will sell and what their holdings will be after the sale. These disclosures would occur before the sale, and the fact of the sale would also become public after the transaction. Plaintiffs fail to explain the relevance of the aborted private placement. Plaintiffs' argument that the private placement agreement was an additional motive and opportunity where the Defendants engaged in fraudulent activity is inapposite and misplaced. Furthermore, the Defendants have retained their substantial holdings of Enzo stock for more than 20 years—this fact strongly negates scienter. *See San Leandro Emergency Med. Group,* 75 F.3d at 813–14; *In re Advanta,* 180 F.3d at 541.

As to Mr. Gross, Plaintiffs have not shown either motive and opportunity or recklessness. The Amended Complaint lacks any allegation that Mr. Gross profited in any way from his alleged misconduct. The only allegation that pertains to Mr. Gross' motive and opportunity is that he told another shareholder, some time after March 2000, that he had purchased 40,000 shares of Enzo, while telling another shareholder that this was untrue. The Court has previously found that this statement is not material as a matter of law; even assuming its materiality, the statement fails to raise a strong inference of scienter as to Mr. Gross because the Amended Complaint utterly fails to show how Mr. Gross benefitted from the misrepresentation. Mr. Gross was not involved in the day-to-day operations of Enzo, he was a consultant. (Am.Compl.¶ 18.) How-

---

4. Defendants contend that Mr. Weiner did not actually sell his shares, but actually transferred 200,000 shares by gift from the RJ Children Corp. to RJ Children Trust. Thus, Mr Weiner did not actually sell his shares as alleged in the Amended Complaint. Howev-

er, the Court accepts the pleadings in the Amended Complaint as true.

5. *In re Burlington Coat Factory,* 114 F.3d at 1423.

ever, his relationship as a consultant to Enzo is not clearly established beyond the conclusory statement that he was authorized to speak on the company's behalf. (*See id.*) Outside of these allegations, Plaintiffs fail to provide the requisite facts relating to the alleged false rumors purportedly disseminated by Mr. Gross. (*Id.* ¶ 92.) The Amended Complaint also lacks the particularized allegations sufficient to show the type of extremely reckless conduct required by the PSLRA. *Phillips,* 190 F.3d at 620. The Plaintiffs fail to specify what information Mr. Gross allegedly had which directly contradicted the statements allegedly made. The Amended Complaint fails to satisfy the pleading requirements as to Mr. Gross' scienter.

### c. *Summary*

From the foregoing, the Court concludes that Plaintiffs' scienter theory—that the Defendants conspired to pump the price of the stock, on two occasions, so that they could sell their stock at this elevated prices—fails because: (1) the Defendants may not be held liable under a conspiracy theory absent individual liability by the alleged conspirators; (2) Mr. DeLucca and Messrs. Rabbani are not primarily liable and their alleged sales do not constitute motive and opportunity nor are their sales considered in the scienter analysis for the remaining Defendants; (3) Mr. Weiner's and Dr. Engelhardt's alleged misrepresentations are either immaterial or supported by fact at the time they were made; (4) the general motive of a corporation or its corporate officers to increase share price and to paint a favorable business picture of the corporation is not sufficient motive for fraud in these circumstances; (5) Plaintiffs' allegations that the insiders benefitted from the alleged sales and transfers of stock are not pled with the requisite specificity; (6) the private placement agreement, allegedly part of the second "pump and dump" scheme, is irrelevant as to scienter because the parties did not carry out the agreement and because an insider sale, either publicly or privately, would have to be disclosed in accordance with 15 U.S.C. § 78p; (7) the Defendants have retained their substantial holdings of Enzo stock for more than 20 years; and (8) Mr. Gross' alleged misrepresentations are immaterial, and, even assuming their materiality, the Amended Complaint lacks a nexus between the alleged misrepresentations and any benefit conferred upon Mr. Gross as a result.

### 4. *Reliance*

Plaintiffs proceed under both a face to face transaction theory and a fraud on the market theory. As previously discussed, to state a valid claim for securities fraud resulting from a face to face transaction, the plaintiff must allege all five elements discussed in *Phillips.* Furthermore, the plaintiffs reliance must be justifiable in light of the information disseminated to the public. *Banca Cremi S.A. v. Alex. Brown & Sons,* 132 F.3d 1017, 1027–28 (4th Cir.1997). When proceeding under a fraud on the market theory, the plaintiff need not plead direct reliance or that the fraudulent practice was in connection with a particular sale or purchase of securities. Instead, the plaintiff need only show the means of dissemination and the materiality of the misrepresentation. *Basic, Inc.,* 485 U.S. at 244, 108 S.Ct. 978; *Texas Gulf Sulphur Co.,* 401 F.2d 833; *Miller,* 101 F.Supp.2d 395.

Plaintiffs allege that they "reasonably relied on those misrepresentations in deciding to purchase Enzo stock." (Am. Compl.¶ 133.) Plaintiffs offer little, if anything at all, beyond this conclusory allegation that supports their contention that they individually relied on any one of the numerous alleged misrepresentations. Plaintiffs provide their brokerage state-

ments setting forth the thousands of daily transactions in Enzo stock. However, Plaintiffs fail to link each alleged purchase and sale with an alleged misrepresentation. For example, during January 2000, Plaintiffs purchased, on January 26, 30,000 shares of Enzo stock and sold 31,000 shares; on January 28, Plaintiffs bought 20,000 shares and sold 20,300 shares; on January 31, Plaintiffs bought 10,000 shares and sold 10,000 shares. The Court finds that the Plaintiffs' brokerage statements evince a pattern of speculative day-trading, an inherently risky undertaking, by sophisticated investors, not "hapless" plaintiffs, who systematically acquired over one million shares over a six-year period. (*See* Am. Compl. ¶¶ 24–27.) Plaintiffs' failure to link each alleged purchase or sale to an alleged misrepresentation is fatal to their claim that they individually relied on these misrepresentations. *See Banca Cremi*, 132 F.3d at 1027–28. Thus, their face to face transaction theory fails as a matter of law.

Plaintiffs also allege that they relied on the integrity of the market when they made their purchases and sales of Enzo stock; however, the Amended Complaint does not support a fraud on the market claim. In order to proceed under a fraud on the market theory, the Plaintiffs need only show the means of dissemination and the materiality of the misrepresentation. *Basic*, 485 U.S. at 244, 108 S.Ct. 978. Plaintiffs must allege with particularity how the alleged false misrepresentations materially affected the market of Enzo stock. *See Nathenson*, 267 F.3d at 413–415. Plaintiffs contend that the market for Enzo stock moved "as a result of the false and misleading statements that were made at the January 2000 annual shareholders' meeting" from $44 to $139 per share within two weeks. (Am.Compl.¶ 45.) Plaintiffs further allege that, within two weeks of the Defendants transferring or selling their shares, the price of Enzo

stock dropped from $81 to $35 per share. (*Id.* ¶ 76.) Plaintiffs also allege that the Enzo stock rose to almost $75 per share as a result of the second "pump." (*Id.* ¶ 95.) Plaintiffs' argument that the market forces, driving the price of Enzo stock, were duped by the alleged misrepresentations is premised on the conclusion that the alleged misrepresentations were material and that reasonable investors would have relied on these statements in valuing Enzo's stock. *See Basic*, 485 U.S. at 246–47, 108 S.Ct. 978; *Phillips*, 190 F.3d at 617; *Nathenson*, 267 F.3d at 413–14. Thus, the materiality of these statements is at issue, once again.

As stated by the Court in Part II.B.2, *supra*, some of the statements were mere "puffing," which are not the types of statements upon which the market relies. *Raab*, 4 F.3d at 289–90 ("Analysts and arbitrageurs rely on facts in determining the value of a security, not mere expressions of optimism from company spokesmen."); *Phillips*, 190 F.3d at 617 ("The market may well take a more jaundiced view of corporate statements—both optimistic puffery and 'holding pattern' statements like the one at hand—than an individual investor."). Furthermore, in evaluating whether a statement is actionable, the Court examines what other public information was available to reasonable investors at the time. *Id.* at 617. The Court previously concluded that the remaining statements were not actionable as a matter of law because they were either explained more thoroughly in Enzo's contemporaneous public filings or were contradicted by the publicly available information. *See* Part II.B.2, *supra*. Thus, the Court finds that the alleged misrepresentations did not affect the price of Enzo stock because the market would not have relied on these immaterial statements.

This finding is further supported by the lack of any market movement after the alleged damaging discussion that took place at the RAC meeting on March 8, 2001. Plaintiffs maintain that they first became aware of the "false and misleading nature of the press releases and other statements of Enzo regarding the efficacy of its HIV treatments when Larry Glaser attended the RAC meeting, ..., on March 8, 2001." (*Id.* ¶ 119.) It follows, from this argument, that the results of the RAC meeting were unfavorable to Enzo and would have negatively impacted the price of Enzo shares. However, during the six weeks following this meeting, the price of Enzo stock actually rose from $18 to $21. Thus, Plaintiffs' allegations fail to show how the market was affected by the allegedly false representations.

Plaintiffs' reliance upon the fraud on the market theory is also misplaced because several of the alleged misrepresentations are described as insider information. The fraud on the market theory is based upon the concept that the market price of shares traded on efficient markets reflects all *publicly* available information. *See Basic,* 485 U.S. at 247, 108 S.Ct. 978. By definition, insider information is information that is not publicly available, and such information may not be used to support a fraud on the market claim. Thus, Plaintiffs' claim fails for this reason as well.

### 5. *Loss and Transaction Causation*

 In a suit brought under Rule 10b–5 (the regulatory extension of section 10(b)), "the plaintiff must show both loss causation—that the misrepresentations of omissions caused the economic harm—and transaction causation—that the violations in question caused the plaintiff to engage in the transaction in question." *Gasner,* 103 F.3d at 360 (quoting *Bennett v. United States Trust Co.,* 770 F.2d 308, 313 (2d

Cir.1985)). Plaintiffs fail to set forth any facts showing that each Enzo Defendant's act or omission proximately caused the loss for which Plaintiffs seek to recover damages. Plaintiffs allege decreases in market price during certain periods and on certain days; however, they make no effort to show how any of the alleged misrepresentations had any effect on the market price during those periods. The Court concludes that the Amended Complaint fails to allege loss causation.

### 6. *Summary of Plaintiffs' Federal Securities Claims*

Plaintiffs' federal securities claims fail for several reasons. First, Plaintiffs' claims are barred by the one-year statute of limitations because Mr. Glaser admitted, before the Bankruptcy Court, that he knew about the alleged fraud no later than January 2001. Plaintiffs filed their initial complaint on March 6, 2002, more than one year after January 2001. Second, Plaintiffs fail, on several occasions, to plead fraud with the requisite specificity. Even if pled with specificity, the alleged misstatements are not material because: (1) they are puffery not actionable as a matter of law; (2) public filings supported the statements; (3) "even lies are not actionable when an investor possesses information sufficient to call the misrepresentation into question,"[6] i.e., Enzo's Form 10–K explaining the clinical trial process; (4) they are statements predicting future events not worded as guarantees; (5) Enzo had no duty to report on its ongoing FDA approval process; or (6) the statements were inside information not reasonably calculated to influence the investing public.

Third, Plaintiffs may not proceed under conspiracy theories absent primary liability of the conspirators. Specifically, Mr. DeLucca and Messrs. Rabbani are not

---

**6.** *Phillips,* 190 F.3d at 617.

primarily liable because Plaintiff's fail to set forth how these defendants perpetrated a fraud. As to Mr. Weiner and Dr. Engelhardt and Mr. Gross, the Amended Complaint fails to set forth a cogent theory of scienter. Fourth, Plaintiffs fail to link each alleged purchase or sale to an alleged misrepresentation. Furthermore, Plaintiffs fail to show how the market relied on the alleged misrepresentations. Fifth, the Amended Complaint fails to set forth any facts showing that each Enzo Defendant's act or omission proximately caused the loss for which Plaintiffs seek to recover damages. For the reasons stated in this section, the Court dismisses Counts I and II of the Amended Complaint as to all Defendants. Plaintiffs also contend that the Individual Defendants are liable as controlling persons under 15 U.S.C. § 78t(a). Having found that neither Enzo nor the Individual Defendants are liable under either Count I or Count II, the Court dismisses any "controlling person" liability claims in the Amended Complaint as to all Defendants.

## C. Common Law Fraud—Count III

■ Under Virginia law, in order to prevail on a claim of fraud, the plaintiff must prove by clear and convincing evidence "(1) a false representation (2) of a material fact (3) made intentionally and knowingly (4) with intent to mislead, (5) reliance by the party misled, and (6) resulting damage to the party misled." *Richmond Met. Auth. v. McDevitt St. Bovis, Inc.*, 256 Va. 553, 507 S.E.2d 344, 346 (1998). Plaintiffs' claim for violation of Virginia common law fraud, Count III, fails for some of the same reasons set forth in the federal securities claim analysis, Part II.B., supra. The heightened pleading requirements of Federal Rule of Civil Procedure continue to apply to the common law claims; although the heightened pleading standards set forth in the PSLRA do not apply. However, as discussed in

Part II.B.2, Plaintiffs fail to set forth any material misrepresentations of fact. Furthermore, Plaintiffs fail to show, either generally or specifically, how their trading activity evinces reliance on the alleged misstatements. For the reasons stated in Part II.B. of this Memorandum Opinion, the Court dismisses Count III of the Amended Complaint.

## D. Breach of Fiduciary Duty—Count IV

■ The Court dismisses the breach of fiduciary duty claim against the Individual Defendants because this type of claim may only be asserted derivatively on behalf of the corporation. *Simmons v. Miller*, 261 Va. 561, 544 S.E.2d 666, 674 (2001); *Storey v. Patient First Corp.*, 207 F.Supp.2d 431 (E.D.Va.2002). Thus, as a matter of law, the breach of fiduciary duty claim is foreclosed in this case, and the Court dismisses Count IV as to all Defendants.

## III. CONCLUSION

As the Fourth Circuit has so eloquently stated:

Plaintiffs who can allege they have been injured by reliance on fraudulent misstatements or omissions of material current facts can state a cause of action. Those like [the plaintiffs], who can only allege injury from purported reliance on future projections that did not prove accurate and so for this reason assertedly must be fraudulent, cannot. These are, to be sure, rigorous requirements that do, and will continue to, eliminate many claims at a preliminary stage. This seems justified, however, because "in this type of litigation ... the mere existence of an unresolved lawsuit has settlement value to the plaintiff not only because of the possibility that he may prevail on the merits, an entirely legitimate component of settlement value, but

[also] because of the threat of extensive discovery and disruption of normal business practices ...."

*Hillson Partners L.P.,* 42 F.3d at 220 (quoting *Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 742–43, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975)). This is the Plaintiffs' fourth attempt at formulating a complaint against these Defendants. Plaintiffs have had the benefit of preparing their Amended Complaint after thirteen months of discovery under Bankruptcy Rule 2004. Plaintiffs were also able to review two previously filed motions to dismiss advising them of several infirmities in their previous complaints. By voluntarily dismissing their second complaint and taking advantage, twice, of their ability to amend as of right, Plaintiffs have had four bites at the apple. The Court finds that amending the complaint would be futile in light of the many opportunities that Plaintiffs have had to present their claim; furthermore, the claims are barred as a matter of law.

As set forth in this Memorandum Opinion, Plaintiffs fail to plead their federal securities claims with the specificity required by the PSLRA. Furthermore, Plaintiffs fail to allege any material misrepresentations, a strong inference of scienter, reasonable reliance—either directly or indirectly, or loss causation; thereby, the Court dismisses Counts I and II of the Amended Complaint. The Court also dismisses the common law fraud claim—Count III, and the breach of fiduciary duty claim—Count IV. The Court grants Enzo Biochem, Inc., Barry Weiner, Elazar Rabbani, Sharim Rabbani, John DeLucca and Dean Engelhardt's, and Heimon Gross's motions to dismiss the Amended Complaint pursuant to Rules 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure.

In sum, for the foregoing reasons, it is hereby

ORDERED that Defendants', Enzo Biochem, Inc., Barry Weiner, Elazar Rabbani, Shahram Rabanni, Dean Engelhardt and John DeLucca, Motion to Dismiss the Amended Complaint is GRANTED. It is further

ORDERED that Defendant Heimon Gross's Motion to Dismiss the Amended Complaint is GRANTED. It is further

ORDERED that Plaintiff's Amended Complaint is DISMISSED as to all Counts and as to all remaining Defendants. It is further

ORDERED that Plaintiffs', Lawrence F. Glaser and Maureen Glaser, individually and on behalf of Kimberly, Erin, Hannah and Benjamin Glaser, are DENIED leave to amend the complaint.

The Clerk is directed to forward a copy of this Order to counsel.