**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

---

**No. 03-2188**

---

LAWRENCE F. GLASER; MAUREEN GLASER, individually and on behalf of Kimberly, Erin, Hannah, and Benjamin Glaser,

                                        Plaintiffs - Appellants,

        versus

ENZO BIOCHEM, INCORPORATED; HEIMAN GROSS; BARRY WEINER; ELAZAR RABBANI; SHARIM RABBANI; JOHN DELUCCA; DEAN ENGELHARDT; JOHN DOE 1-50,

                                        Defendants - Appellees,

        and

RICHARD KEATING; DOUG YATES,

                                        Defendants.

---

Appeal from the United States District Court for the Eastern District of Virginia, at Alexandria.  Gerald Bruce Lee, District Judge. (CA-02-1242-A)

---

Argued:  September 30, 2004          Decided:  March 21, 2005

---

Before WILKINSON, GREGORY, and SHEDD, Circuit Judges.

---

Affirmed in part, reversed in part, and remanded by unpublished opinion.  Judge Shedd wrote the opinion, in which Judge Gregory joined.  Judge Wilkinson wrote an opinion concurring in part and dissenting in part.

**ARGUED:** Michael J. Rovell, Chicago, Illinois, for Appellants. Donald Howard Chase, MORRISON, COHEN, SINGER & WEINSTEIN, New York, New York, for Appellees. **ON BRIEF:** Lisa I. Fair, LAW OFFICES OF MICHAEL J. ROVELL, Chartered, Chicago, Illinois, for Appellants. Robert R. Vieth, Patricia T. Giles, COOLEY GODWARD, L.L.P., Reston, Virginia; David A. Piedra, MORRISON, COHEN, SINGER & WEINSTEIN, New York, New York, for Appellees Enzo Biochem, Incorporated, Barry Weiner, Elazar Rabbani, Sharim Rabbani, John DeLucca, and Dean Englehardt. K. Stewart Evans, Jr., PEPPER HAMILTON, L.L.P., Washington, D.C., for Appellee Heiman Gross.

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

SHEDD, Circuit Judge:

The plaintiffs, Lawrence F. Glaser and his family, appeal the dismissal of their claims for federal securities fraud, conspiracy, and common law fraud against Enzo Biochem, Inc. ("Enzo") and individual defendants Barry Weiner, Elazar Rabbani, Shahram Rabbani, Dean Engelhardt, John DeLucca, and Heimon Gross. After denying the plaintiffs leave to amend their complaint, the district court dismissed the federal securities fraud claim based on the applicable statute of limitations and dismissed the remaining claims for failure to state a claim upon which relief could be granted. For the reasons that follow, we affirm in part, reverse in part, and remand for further proceedings.

I.

Enzo is a publicly traded biotechnology company engaged in research and development of treatments to combat the human immunodeficiency virus ("HIV") and other diseases. During the period from 1994 to 2000, Glaser purchased more than one million shares of Enzo stock. According to the plaintiffs' amended complaint, Enzo, through press releases and statements made by its officers, exaggerated the preliminary success of a new HIV treatment in 2000 and misled investors concerning the prospects for marketing that treatment. As a result, Glaser continued to purchase Enzo stock at a time when Enzo's officers and directors

were selling their stock at inflated prices. After Enzo's stock price dropped precipitously in the spring of 2000, Glaser was left holding more than one million shares, many of which had been purchased on margin. Glaser and his wife were forced into bankruptcy.[1]

The plaintiffs specifically complain about statements made by Enzo officers during the January 12, 2000, annual shareholders' meeting. At that meeting, Enzo manager Dean Engelhardt announced that Enzo had developed a new treatment to combat HIV. According to Engelhardt, this new treatment was like a "roach motel," where "the virus goes in but does not come out." J.A. 267. Engelhardt stated that although the Food and Drug Administration ("FDA") would not allow him to say that Enzo had cured AIDS, Enzo's new treatment "works" and it kills the virus. J.A. 267. The amended complaint alleges that these statements were false because preliminary trials had not, in fact, yielded results that would satisfy the FDA's efficacy requirements for such a treatment.

During the same January 12 meeting, Enzo's president, Barry Weiner, reported that Enzo planned to open three more clinics by the end of the fiscal year to treat HIV and AIDS patients. J.A. 267. Each clinic would be able to treat 9,500 patients at a charge

---

[1]Because we are reviewing a Rule 12(b)(6) dismissal, we "must take all well-pleaded material allegations of the [amended] complaint as admitted and view them in the light most favorable to the plaintiff." De Sole v. United States, 947 F.2d 1169, 1171 (4th Cir. 1991).

4

of $30,000 per patient. The amended complaint alleges that this representation was false because Enzo did not have permission from the FDA to open any new clinics, nor had Enzo even sought such permission. Weiner also stated that Enzo had submitted its Phase I trial data to the FDA and that the company was awaiting approval to proceed to Phase II trials.[2] J.A. 268. In fact, Enzo did not even have Phase I data in hand that it could submit to the FDA at that time.

Weiner made further representations concerning the so-called HGTV-43 vector, a key component of a new gene therapy developed by Enzo. In a process called transduction, the HGTV-43 vector would deliver certain genes to human cells. With this new gene, these cells were engineered to enhance immune responses. Weiner stated at the January 12 meeting that Enzo scientists had been able to reduce the time period required for successful transduction from a period of up to three months to a period of only eighteen hours; that HGTV-43 was able to achieve levels of stable transduction to patients' non-growing blood stem cells greater than 30%; and that the HGTV-43 vector was ready for commercialization. J.A. 268-69. In a press release regarding Enzo's gene therapy and the HGTV-43 vector, Enzo also stated that it was exploring expansion of its

---

[2]Clinical trials for new treatments are conducted in phases. Phase I trials involve a smaller number of patients and primarily assess the safety and preliminary efficacy of the treatment. Phase II trials involve a larger number of patients and are focused on the ultimate efficacy of the treatment.

5

clinical trials. J.A. 269. Weiner failed to mention, however, that Enzo had modified its transduction protocol due to the absence of any positive data from initial research or that this lack of positive data had slowed down the development of Enzo's gene therapy and delayed clinical trials. Despite Weiner's assurance that the HGTV-43 vector was ready for commercialization, Enzo had not marketed that product by the time the plaintiffs filed their complaint.

Although share prices for Enzo usually fluctuated by approximately $1 per share to $3 per share after annual meetings and trading volumes average only two million shares, in the eight trading days after the January 12 meeting Enzo's stock price soared $90 per share -- from $43 to $133 -- at a trading volume of more than thirteen million shares.

Within a few months after the January 12 meeting, one Enzo director sold all of his holdings, valued at approximately $2 million. Three of Enzo's five directors sold a total of 600,000 shares at $81 per share, and Engelhardt, who made several of the statements at issue in this case, sold 5,000 shares at $70 per share. Enzo's stock price began to decline immediately, and within two weeks it was down to $35 per share.

In response to this devaluing of the stock, Enzo managers issued a press release assuring investors that "[t]he recent activity of the stock merely mirrors the general weakness that has

affected the entire biotech industry and in no way reflects Enzo's intrinsic value." J.A. 274. This press release further stated that a clinical study at the University of California was moving toward its final stages; HGTV-43 had successfully delivered certain genes to blood stem cells outside the human body; following transduction and infusion into patients, the genetically engineered cells continue to survive and behave in a manner consistent with the goals of the treatment; an abstract concerning the therapy had been accepted for presentation to the American Society of Gene Therapy in June 2000; Enzo knew of no other therapy that had achieved the results that Enzo's gene therapy achieved; and plans for Phase II clinical studies were proceeding. J.A. 274-75. This press release misrepresented key facts concerning Enzo's gene therapy. Enzo's trials had not yielded particularly positive results, and in some cases produced negative results; Enzo failed to mention that the data it collected was based on only five patients; and Enzo had not applied for Phase II approval, nor did it have a schedule in place for Phase II testing.

Once its stock price dropped to $35, Enzo issued another press release. According to this release, all remained well with Enzo, the ongoing clinical trials were on schedule, and Enzo had no explanation for the collapse in the stock price. J.A. 277. These statements were false in that Enzo had no schedule in place for the ongoing clinical trials, and Enzo did have at least a partial

7

explanation for the drop in stock price, <u>i.e.</u>, the transfer of 600,000 shares by top-level managers.

In October 2000, Enzo issued a press release reporting that "new data on the first individual treated in the Phase I clinical trial of HGTV-43, the company's HIV-1 gene medicine product, show that after nine and one-half months Enzo engineered cells have successfully engrafted the patient's bone marrow and were spawning new . . . cells designed to fight the virus."  J.A. 285-86.  Contrary to this statement, Enzo disclosed data in March 2001 showing that engraftment had actually failed.

The devaluation of Enzo stock resulted in significant losses for Glaser.  By April 2000, Glaser held more than one million shares of Enzo stock, and he was forced to liquidate these holdings in order to cover debts for shares purchased on margin.  Glaser and his wife ultimately filed for bankruptcy protection.

During the course of his bankruptcy proceeding, Glaser came to believe that Enzo was involved in a "massive securities fraud" and sought discovery from Enzo concerning that fraud.  J.A. 740A.  The bankruptcy court granted Glaser's motion for discovery.  In March 2002 -- more than a year after filing his motion for discovery in the bankruptcy court -- Glaser filed a complaint alleging federal securities fraud and common law fraud against Enzo.  Glaser voluntarily dismissed this initial complaint.  In August 2003, Glaser and his family initiated this lawsuit by filing a new

8

complaint alleging violations of federal securities laws, civil conspiracy, and common law fraud.

The district court dismissed the federal securities fraud claim on the ground that the applicable one-year statute of limitations had run before the complaint was filed. The district court then dismissed the plaintiffs' conspiracy claim as a matter of law, ruling that federal securities laws do not contemplate liability for conspiracy just as they do not for aiding and abetting. Finally, the district court dismissed the plaintiffs' common law fraud claim on the grounds that the plaintiffs failed to allege (1) that the specified misrepresentations concerned material facts or (2) that they actually relied on any such misrepresentations. Although the plaintiffs sought leave to amend their complaint further, the district court ruled that any repleading would be futile and denied the request. The plaintiffs now appeal each of these adverse rulings.

II.

The district court dismissed the plaintiffs' federal securities fraud claim against Enzo based on the statute of limitations. The plaintiffs argue that their claim is timely under the one-year statute of limitations provided in the Securities Exchange Act. Even if their claim is not timely under the

Securities Exchange Act, the plaintiffs contend that it is timely under the Sarbanes-Oxley Act.

A.

The statute of limitations for a securities fraud claim under the Securities Exchange Act is one year, and it begins to run when the plaintiff is put on inquiry notice of the facts constituting the alleged violation.  15 U.S.C. § 78i(e); Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson, 501 U.S. 350, 363 (1991).  A plaintiff's awareness of the possibility of fraud, not complete exposure of the fraud, triggers inquiry notice.  Brumbaugh v. Princeton Partners, 985 F.2d 157, 162 (4th Cir. 1993).  "Merely bringing suit after the scheme has been laid bare . . . will not satisfy the requirements of due diligence when there have been prior warnings that something was amiss."  Id.  Where the underlying facts are undisputed, the question whether the plaintiffs were on inquiry notice may be decided as a matter of law.  Id.  We review de novo the district court's ruling that the plaintiffs filed this lawsuit more than one year after being put on inquiry notice of possible fraud.  Franks v. Ross, 313 F.3d 184, 192 (4th Cir. 2002).

Glaser was on inquiry notice as early as February 7, 2001, when he sought discovery from Enzo in the bankruptcy court.  Glaser explained to the bankruptcy court that he was seeking discovery because he had already "gathered evidence to suggest a massive

10

securities fraud and the manipulation of Enzo stock both inside and outside the company, the exact scope of which is presently unknown." J.A. 740A. Indeed, the amended complaint filed in this case states that the plaintiffs "sought to substantiate their suspicions concerning their belief that securities fraud had been committed by using Bankruptcy Rule 2004," which governs discovery. J.A. 291. Thus, by the time Glaser filed his motion for discovery on February 7, he was aware of "evidence of the possibility of fraud," and the limitations period began to run. Brumbaugh, 985 F.2d at 162. The plaintiffs did not file this lawsuit, however, until August 2002, more than one year after the date on which they were put on inquiry notice of possible securities fraud.[3]

B.

The plaintiffs seek to take advantage of the two-year limitations period provided by § 804(a) of the Sarbanes-Oxley Act, which took effect on July 30, 2003. Sarbanes-Oxley Act of 2002, Pub. L. No. 107-204, 116 Stat. 745, 804 (2002) ("Sarbanes-Oxley"). The plaintiffs filed their original complaint prior to the enactment of Sarbanes-Oxley but voluntarily dismissed that action.

---

[3]The plaintiffs argue that their failure to file within one year of inquiry notice should be excused because Enzo "stonewalled and obstructed their discovery" during the period from May 2001 to February 2003. This argument is meritless. As we have explained, the plaintiffs had sufficient knowledge on February 7, 2001, to be on inquiry notice. Even if Enzo's subsequent conduct in discovery delayed the plaintiffs' full understanding of the alleged fraud, it did not prevent the plaintiffs from filing a complaint within one year of inquiry notice.

11

They filed the present complaint after the enactment of Sarbanes-Oxley in an attempt to take advantage of the extended limitations period.

The plaintiffs' refiling after Sarbanes-Oxley took effect did not revive any claim that was otherwise barred by the statute of limitations. As the Supreme Court has noted, "extending a statute of limitations after the pre-existing period of limitations has expired" essentially creates a new cause of action by reviving an otherwise "moribund cause of action." Hughes Aircraft Co. v. United States ex rel. Schumer, 520 U.S. 939, 950 (1997); accord In re Enterprise Mortgage, ___ F.3d ___, 2004 WL 2785776, at *4; Chenault v. United States Postal Serv., 37 F.3d 535, 539 (9th Cir. 1994). Section 804(c) of Sarbanes-Oxley, however expressly indicates an intention not to create any new causes of action. Although § 804(b) states that the new two-year statute of limitations "shall apply to all proceedings . . . that are commenced on or after the date of enactment of [Sarbanes-Oxley]," this language does not clearly express an intention to revive otherwise stale claims. See In re Enterprise Mortgage Acceptance Co., LLC, Sec. Litig., ___ F.3d ___, 2004 WL 2785776, at *3-*4 (2d Cir. Dec. 6, 2004). We agree with the district court that Sarbanes-Oxley does not revive the plaintiffs' otherwise untimely securities fraud claim.

12

III.

The plaintiffs next argue that the district court erred in dismissing their conspiracy claim against the individual defendants. The Supreme Court held in Central Bank, N.A. v. First Interstate Bank, N.A., 511 U.S. 164 (1994), that there is no civil liability for aiding and abetting a violation of § 10(b). Id. at 177. "[T]he statute prohibits only the making of a material misstatement (or omission) or the commission of a manipulative act. The proscription does not include giving aid to a person who commits a manipulative or deceptive act." Id. (internal citations omitted). Following Central Bank, we have stated that "a misrepresentation must be directly attributable to [the defendant] and not to some other person." Gariety v. Grant Thornton, LLP, 368 F.3d 356, 369 (4th Cir. 2004).

The rationale of Central Bank with respect to aiding and abetting applies equally to civil conspiracy. See 511 U.S. at 200 n.12 (Stevens, J., dissenting) (stating that "[t]he Court's rationale would sweep away the decisions recognizing that a defendant may be found liable in a private action for conspiring to violate § 10(b) and Rule 10b-5"). The statute itself makes no mention of liability for conspiracy, and recognizing such liability would allow plaintiffs to "circumvent the reliance requirement," a key limitation on securities fraud claims. Id. at 180. Thus, we conclude that there can be no civil liability for conspiracy to

13

commit securities fraud.  Accord Dinsmore v. Squadron, Ellenoff, Plesent, Sheinfeld & Sorkin, 135 F.3d 837, 841 (2d Cir. 1998); In re GlenFed, Inc., Sec. Litig., 60 F.3d 591, 592 (9th Cir. 1995).

Our conclusion is not altered by the post-Central Bank enactment of 15 U.S.C. § 78t(e), which authorizes criminal prosecution of persons who aid and abet securities law violations. Nothing in this provision creates a private right of action for aiding and abetting.  See Ziemba v. Cascade Int'l, Inc., 256 F.3d 1194, 1205 n.6 (11th Cir. 2001); Wright v. Ernst & Young LLP, 152 F.3d 169, 176 (2d Cir. 1998).  In sum, the district court properly followed the reasoning of Central Bank and dismissed the plaintiffs' conspiracy claims as a matter of law.

IV.

The plaintiffs next challenge the dismissal of their common law fraud claim.  Under Virginia law, a plaintiff seeking to recover for fraud must allege: (1) a false representation, (2) of a material fact, (3) made intentionally and knowingly, (4) with intent to mislead, (5) reliance by the party misled, and (6) resulting damage to the party misled.  Bank of Montreal v. Signet Bank, 193 F.3d 818, 826 (4th Cir. 1999) (applying Virginia law); Richmond Metro. Auth. v. McDevitt St. Bovis, Inc., 507 S.E.2d 344, 346 (Va. 1998).

14

At issue in this appeal are twelve alleged misrepresentations concerning Enzo's development of a new HIV treatment and gene therapy. The first category of misrepresentations includes statements made by Engelhardt at the January 12 shareholders meeting:

- "It works, they both work," referring to Enzo's gene therapy treatments for HIV and Hepatitis B.

- The "virus goes in but does not come out," and Enzo has killed the virus.

The second category of misrepresentations include Enzo president Weiner's statements at the January 12 meeting:

- Enzo would be opening three more clinics to treat HIV/AIDS patients by the end of fiscal year 2000.

- Enzo had submitted Phase I data to the FDA and was awaiting Phase II approval.

- Enzo scientists had reduced the time required for HGTV-43 transduction from up to three months to eighteen hours.

- The HGTV-43 vector achieves levels of stable transduction greater than 30%.

- The HGTV-43 vector was ready for commercialization.

The final category of statements consists of statements made by Enzo in various press releases issued after the January 12 meeting:

- Enzo was exploring expansion of the trials for its gene therapy.

- The University of California clinical study was moving to its final stages, an abstract was to be presented to the American Society of Gene Therapy in June 2000, Enzo knew of no other system that achieved the results that its gene therapy had

15

achieved, and plans for Phase II trials were proceeding.

- The HGTV-43 vector successfully delivered certain genes to blood stem cells and engineered cells continued to survive after transduction.

- All remained well and on schedule.

- Data from the first person treated in the Phase I trial of HGTV-43 showed successful engraftment of engineered cells into the patient's bone marrow.

Accepting the material allegations of the amended complaint as admitted and viewing them in the light most favorable to the plaintiffs, DeSole, 947 F.2d at 1171, these representations were false. Nevertheless, the district court dismissed the plaintiffs' fraud claim on the grounds that (1) none of these misrepresentations concerned a material fact, and (2) the plaintiffs had failed to allege that they reasonably relied on these misrepresentations. We disagree.

A.

Under Virginia law, recovery for fraud requires proof that the fact misrepresented be material and substantially affect the interests of the plaintiff. J.E. Robert Co. v. J. Robert Co., Inc. of Va., 343 S.E.2d 350, 345 (Va. 1986) (citing Packard Norfolk, Inc. v. Miller, 95 S.E.2d 207, 211 (Va. 1956)). A fact is material if it "influences a person to enter into a contract," or if it "deceives him and induces him to act," or if "without it the transaction would not have occurred." Packard Norfolk, 95 S.E.2d at 211-12. Unfulfilled promises or statements as to future events

16

typically do not constitute material facts that will support a fraud claim, and "[s]tatements which are vague and indefinite in their nature and terms, or are merely loose, conjectural or exaggerated, go for nothing." Tate v. Colony House Builders, Inc., 508 S.E.2d 597, 599 (Va. 1999). Similarly, "commendatory statements, trade talk, or puffing, do not constitute fraud because statements of this nature are generally regarded as mere expressions of opinion." Lambert v. Downtown Garage, Inc., 553 S.E.2d 714, 717 (Va. 2001).

There can be no doubt that the efficacy of Enzo's new HIV treatment -- including both the direct treatment and the gene therapy -- is a material fact for Enzo investors. The fact that Enzo's treatment works or does not work would be important to any investor's decisionmaking. Likewise, the progress of clinical trials for Enzo's new treatment would be an important fact to consider in deciding whether to buy or sell Enzo shares. Thus, all statements concerning the efficacy of Enzo's treatment or the actual progress of clinical trials satisfy the materiality requirement. See Packard Norfolk, 95 S.E.2d at 211-12.

By contrast, Weiner's statements that (1) Enzo would open three new clinics within the fiscal year and (2) the HGTV-43 vector was ready for commercialization are not actionable because they amount to unfulfilled promises or statements as to future events. See Tate, 508 S.E.2d at 599. The statement in a press release that

17

"all remained well" at Enzo is vague and indefinite, a commendatory statement, or puffery that cannot give rise to an actionable fraud claim. See Lambert, 553 S.E.2d at 717; Tate, 508 S.E.2d at 599.[4]

B.

"In order to prove reliance, a plaintiff must demonstrate that its reliance upon the [defendant's] representation was reasonable and justified." Hitachi Credit Am. Corp. v. Signet Bank, 166 F.3d 614, 629 (4th Cir. 1999) (applying Virginia law) (internal quotations omitted); see also Bank of Montreal, 193 F.3d at 827 (stating that "[i]n all cases of fraud [under Virginia law] the plaintiff must prove that it acted to its detriment in actual and justifiable reliance on the defendant's misrepresentation (or on the assumption that the concealed fact does not exist)"). With

_____

[4]As an additional ground for dismissal, we conclude that the plaintiffs' allegations with respect to Weiner's statements that (1) Enzo would open three new clinics to treat HIV/AIDS patients within the fiscal year and (2) the HGTV-43 vector was ready for commercialization, as well as the statement in a press release that Enzo was exploring expansion of its clinical trials, are allegations of "fraud by hindsight." See Hillson Partners Ltd. P'ship v. Adage, Inc., 42 F.3d 204, 209 (4th Cir. 1994) ("Where fraudulent projections are alleged, the plaintiff must . . . identify in the complaint with specificity some reason why the discrepancy between a company's optimistic projections and its subsequently disappointing results is attributable to fraud. . . . Mere allegations of 'fraud by hindsight' will not satisfy the requirements of Rule 9(b)."). The plaintiffs alleged simply that (1) Enzo did not, in fact, open three new clinics, (2) the HGTV-43 vector was not, in fact, commercialized, and (3) the clinical trials were not, in fact, expanded. The plaintiffs did not allege that these statements were known to be false when made.

18

respect to representations concerning concrete facts, we have noted that "[t]he touchstone of reasonableness is prudent investigation," and a plaintiff cannot claim to reasonably rely upon a misrepresentation when he "makes a partial inquiry, with full opportunity of complete investigation, and elects to act upon the knowledge obtained from the partial inquiry." Hitachi Credit, 166 F.3d at 629 (citing Harris v. Dunham, 127 S.E.2d 65, 71-72 (Va. 1962)).

The plaintiffs alleged that they retained and continued to purchase Enzo stock in reliance on the good news coming from Engelhardt, Weiner, and the various press releases touting the new HIV treatment's preliminary success. J.A. 262, 270, 271, 277, 287, 293, 294. The district court ruled, however, that the plaintiffs could not have reasonably relied upon these misrepresentations because Enzo's Form 10-K contained a "disclaimer" that should have put the plaintiffs on notice that Phase I trials did not actually test the efficacy of Enzo's treatment.[5]

We disagree. The Form 10-K states that "Phase I trials, concerned primarily with the safety and preliminary effectiveness of the drugs, involve fewer than 100 subjects. Phase II trials normally involve a few hundred patients and are designed primarily

---

[5]The district court discussed the Form 10-K in its analysis of materiality under the federal securities laws. Under Virginia law, the district court's concern about the Form 10-K is more appropriately addressed as a matter of reliance rather than materiality.

19

to demonstrate effectiveness in treating or diagnosing the disease. . . ." J.A. 696 (emphasis added). This "disclaimer" actually suggests that the Phase I trials of Enzo's HIV treatment <u>did</u> test the efficacy of that treatment, if only to a preliminary degree, and the district court's assertion that these trials "merely tested whether the drug was safe in order to proceed to Phase II," J.A. 48, is simply unsupported. Thus, we cannot say, for purposes of a motion to dismiss, that the plaintiffs' alleged reliance upon the various misrepresentations was unreasonable or unjustified as a matter of law.

V.

Finally, the plaintiffs argue that they should have been granted leave to amend their complaint. We review the district court's decision to deny the plaintiffs' motion to amend for abuse of discretion. <u>Foman v. Davis</u>, 371 U.S. 178, 182 (1962); <u>GE Inv. Private Placement Partners II v. Parker</u>, 247 F.3d 543, 548 (4th Cir. 2001). Although leave to amend should "be freely given when justice so requires," Fed. R. Civ. P. 15(a), the district court may deny leave to amend for reasons "such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of the allowance of the amendment, futility of amendment, etc." <u>Foman</u>, 371 U.S. at 182. Because we

20

conclude that the federal securities fraud and conspiracy claims were barred as a matter of law, we agree with the district court that any amendment as to these claims would be futile. To the extent that the plaintiffs argue that they should have been permitted to amend their complaint to include a claim for conspiracy to commit common law fraud, we conclude that the district court did not abuse its discretion in ruling that the plaintiffs' "many opportunities . . . to present their claim" warranted denial of the motion to amend. See Foman, 371 U.S. at 182 (recognizing that leave to amend may be denied because of "repeated failure to cure deficiencies by amendments previously allowed"). As the plaintiffs have adequately alleged a claim for common law fraud, amendment of perceived deficiencies in that claim is unnecessary. Of course, we do not foreclose any future amendments that may be appropriate under Fed. R. Civ. P. 15(a).

VI.

The district court properly dismissed the plaintiffs' federal securities fraud and conspiracy claims as a matter of law. Because the plaintiffs sufficiently alleged common law fraud under Virginia law, however, we reverse the district court's dismissal of that

claim and remand the case for further proceedings consistent with this opinion.[6]

<u>AFFIRMED IN PART, REVERSED IN PART, AND REMANDED</u>

---

[6]In sum, only eight of the twelve identified misrepresentations remain for consideration on remand. The statements concerning the opening of new clinics, the readiness of HGTV-43 for commercialization, and Enzo's exploring expansion of clinical trials, as well as the statement that all remained well at Enzo despite the drop in stock price, were properly dismissed as bases for the plaintiffs' common law fraud claim.

22

WILKINSON, Circuit Judge, concurring in part and dissenting in part:

I concur in much of the majority opinion. The federal claims were properly dismissed as time-barred, and the conspiracy claims were properly dismissed as well. But as to the Virginia common law fraud claims, I do not believe that two of the eight remaining statements are actionable because they are too general. Specifically, representations that "it works, they both work," and that the "virus goes in but does not come out," seem far too brief and too general to state a claim in fraud.

All of this is a matter of Virginia law. Nowhere has the Virginia Supreme Court come close to saying that statements of this general a nature present a viable basis for a fraud claim. Quite the opposite: the court has expressly rejected claims predicated on expressions of opinion, unfulfilled promises, statements as to future events, puffing, "dealer talk," or "booster statements." The Virginia Supreme Court has repeated that:

> [i]t is well settled that a misrepresentation . . . must be of an existing fact, and not the mere expression of an opinion. The mere expression of an opinion, however strong and positive the language may be, is no fraud. Such statements are not fraudulent in law, because . . . they do not ordinarily deceive or mislead. Statements which are vague and indefinite in their nature and terms, or are merely loose, conjectural or exaggerated, go for nothing, though they may not be true, for a man is not justified in placing reliance upon them.

Mortarino v. Consultant Eng'g Servs., Inc., 467 S.E.2d 778, 781 (Va. 1996) (quoting Saxby v. So. Land Co., 63 S.E. 423, 424 (Va.

23

1909)). While the majority acknowledges that unfulfilled promises or future statements cannot be actionable, the Virginia Supreme Court has added that neither "can 'booster' statements of enthusiastic agents be depended upon. They are to be expected." King v. Commercial Fin. Co., 175 S.E. 733, 736 (Va. 1934) (internal citation omitted).

There is a reason for this reluctance to allow puffing, generalities, opinions, or merchant talk to form the basis for a foray into court. We live in a free enterprise system in which it is almost inescapable that people will puff their wares. One cannot, and the law does not, expect companies to disown their own products. Any reasonable investor, therefore, treats such statements with a healthy degree of skepticism. The law has never protected those who do not. See Bank of Montreal v. Signet Bank, 193 F.3d 818, 827 (4th Cir. 1999) (collecting Virginia cases).

This is one reason that the statements at issue are not actionable, and this reason is further connected with the reliance element of common law fraud. "[O]ne who seeks to hold another in fraud must clearly show that he has relied upon the acts and statements of the other." Harris v. Dunham, 127 S.E.2d 65, 70 (Va. 1962). Virginia law has long placed investors at their peril when they incautiously rely on puffing or "booster" statements. In Akers v. Radford State Bank, 149 S.E. 528 (Va. 1929), the corporation's representative had stated that "not a cent of the

24

[stock's] subscribers' money would be spent" on a railroad until a contractor gave bond and let the railroad. Id. at 531. Appellants alleged that this induced them to subscribe to the stock, but the Virginia Supreme Court rejected the claim, because appellants did not "have any right to rely upon these statements . . . [which were] made at a public booster meeting" held to secure stock subscriptions. Id.

Glaser's claim similarly lacks merit. He has shown great familiarity with Enzo's business yet relied recklessly on booster statements and puffing. The record discloses an astonishing history of day-trading by buying on margin. As the district court was careful to note, "Plaintiffs' brokerage statements evince a pattern of speculative day-trading, an inherently risky undertaking, by sophisticated investors, not 'hapless' plaintiffs, who systematically acquired over one million shares over a six-year period." Glaser v. Enzo Biochem, Inc., 303 F. Supp. 2d 724, 750 (E.D. Va. 2003).

Someone who evinces a trading sophistication like Glaser's should not receive the special solicitude of the law when he fails to observe the most basic norms of commercial activity. In Harris, for instance, after noting that reliance is an essential element of fraud, the Virginia Supreme Court pointedly observed that one party "was an experienced businessman" with "business acumen, [a] familiarity with accounting procedures, and [a] knowledge of

25

financial affairs." Harris, 127 S.E.2d at 70. Sophisticated investors -- such as those who have "conducted [their] own independent investigation into the subject matter of [their] purchase," id. -- rely at their peril, because their reliance on statements like those at issue here are not justifiable. See also Horner v. Ahern, 153 S.E.2d 216, 219 (Va. 1967) (someone who has the ability to protect himself with "ordinary care and prudence" is left by the law "where he has been placed by his own imprudent confidence").

The majority's unwillingness to recognize this legal tradition in Virginia law would have unfortunate implications if it were ever adopted by Virginia courts. It is no accident that Virginia law has developed as it has. Insubstantial suits for securities fraud simply drain energy from an economy that, in essence, is meant to remain entrepreneurial. No one doubts that overselling products like a cure for AIDS would be unfair not only to investors. It would represent a cruel hoax played against a particularly vulnerable segment of our society. On the other hand, holding that statements like the two specifically addressed above are actionable is to pile multiple legal difficulties on top of the already difficult medical challenges involved in vaccine production. Such rulings make it more difficult for vaccines of any sort -- flu, smallpox, AIDS -- to reach market because many vaccine manufacturers now face additional legal disincentives to develop

26

them.    Over the past thirty years, the number of vaccine manufacturers in America has declined from twenty-five to a grand total of five manufacturers today.  Denise Grady, <u>Before Shortage of Flu Vaccine, Many Warnings</u>, <u>N.Y. Times</u>, Oct. 17, 2004, at A1. It is not novel to attribute the disappearance of manufacturers in part to legal claims.  <u>See, e.g.</u>, <u>id.</u> ("Some companies dropped out because of lawsuits," while others found it too burdensome "to meet regulatory standards.")  There may well be multiple causes for the dwindling numbers of vaccine manufacturers in our country, but it seems fair to observe that ungrounded suits in fraud will not assist in reversing the decline.

If the law actually required this consequence, so be it.  But at least the Virginia law of fraud does not.  I agree that six of the twelve statements are more than puffing, although Glaser must still be able to demonstrate on remand a reasonable reliance upon them.  Even if those six could survive a Rule 12(b)(6) motion, the other two never could and were properly dismissed by the district court.  It is this failure to strike an appropriate balance between warranted liability and the unwarranted encouragement of frivolous securities fraud actions that leads me to dissent in part from the majority opinion.