**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

HEIDE BETZ,

    *Plaintiff-Appellant,*

  v.

TRAINER WORTHAM & COMPANY,
INC.; DAVID P. COMO; FIRST
REPUBLIC BANK, a Nevada
corporation; ROBERT VILE,

    *Defendants-Appellees.*

No. 05-15704

D.C. No.
CV-03-03231-SI

OPINION

Appeal from the United States District Court
for the Northern District of California
Susan Yvonne Illston, District Judge, Presiding

Argued and Submitted
February 12, 2007—San Francisco, California

Filed May 11, 2007

Before: John T. Noonan, Jr., Ronald M. Gould, and
Johnnie B. Rawlinson, Circuit Judges.

Opinion by Judge Gould

5543

**COUNSEL**

Joseph M. Alioto, San Francisco, California, Theodore F. Schwartz, St. Louis, Missouri, and Myron Moskovitz, Berkeley, California, for the plaintiff-appellant.

Sara B. Brody and Alexander M.R. Lyon, Heller Ehrman, LLP, San Francisco, California, for the defendants-appellees.

**OPINION**

GOULD, Circuit Judge:

We must decide whether Heide Betz's federal securities fraud claim is barred by the statute of limitations.[1] We hold that Betz's claim is not time barred, and we reverse the district court's summary judgment for the defendants.

---

[1]In a separately-filed memorandum disposition, we resolve Betz's appeal of the district court's disposition of her state law claims.

**I**

On an appeal of summary judgment we, like the district court, view the evidence in the light most favorable to the non-moving party and draw all justifiable inferences in the non-moving party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Viewed in the light most favorable to Betz, the facts are as follows:

In 1999, Betz, a retired art dealer, sold her house for $2.2 million. Betz planned to buy a co-op and invest the proceeds of the sale of her house to provide interest income. An employee of First Republic Bank named Carmen Castro introduced Betz to David Como, an employee of Trainer Wortham, an investment subsidiary of First Republic Bank. Como and Castro recommended that Betz invest the proceeds from the sale of her house with Trainer Wortham. Como and Castro assured Betz that, if she invested her $2.2 million with Trainer Wortham, she could withdraw $15,000 per month from her portfolio, for living expenses, without touching the $2.2 million in principal. Betz told Como and Castro that she knew nothing about stocks and bonds and that she only would understand the "bottom line," or total balance, of her account.

According to Betz, on June 7, 1999, Betz entered into an oral agreement with Como, who was acting on behalf of Trainer Wortham, giving the defendants control over her $2.2 million. Betz and Como agreed that Como would invest Betz's money "in such a fashion that [Betz] would receive $15,000 a month from the profit of the investment and that [the defendants] would not touch the principal." The same day, Betz and Como, who was again acting on Trainer Wortham's behalf, entered into a written "Letter of Understanding for Portfolio Management and Administration Services" and an "Investment Management Agreement." These documents explicitly stated that Betz's account was subject to market risk and that "no person has represented to [Betz] that any particular result can or will be achieved."

After Betz opened her account with Trainer Wortham, she received account statements at least once per month. In February 2000, Betz received a statement reflecting an account value below her initial investment of $2.2 million. Between February 2000 and July 2001, Betz received twenty-nine more account statements, each reflecting an account balance of less than $2.2 million. In March 2001, Betz's account balance had dropped to $848,000. Around that time, Betz spoke with Robert Vile, a Trainer Wortham employee, to express concern about the declining value of her account. Vile told Betz that the declining balance was temporary, that the market would recover, and that in less than a year her account balance would be back to $2.2 million.

However, a year later, in the spring of 2002, Betz's account balance had not recovered. At that time, Castro told Betz that there was a "serious problem" with the way Betz's portfolio had been managed and that the president of Trainer Wortham, Charles Moore, would "take care of the account because it was 'the right thing to do' and because [Trainer Wortham] value[d] their client relationships." After Betz met with Moore in person, Castro called Betz to tell her that "Moore was meeting with other principals and attorneys" regarding her account, and that Betz "should be patient with them and not take any legal action." However, in June 2002, Castro advised Betz that Trainer Wortham was "not going to do anything at all" to remedy the declining value of her account.

Betz filed her complaint in this case on July 11, 2003, alleging that Como, Vile, Trainer Wortham, and First Republic Bank (collectively, "Trainer Wortham" or "defendants") had committed securities fraud in violation of § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b-5 of the Securities Exchange Commission, 17 C.F.R. § 240.10b-5. The defendants moved for summary judgment on the ground that Betz's federal securities fraud claim was barred by the statute of limitations. Section 804(a) of the Sarbanes-Oxley Act of 2002, Pub. L. No. 107-204, 116

Stat. 745, 801 (codified at 28 U.S.C. § 1658(b)), provides that a suit for securities fraud under § 10(b) of the Securities Exchange Act must be filed "not later than the earlier of (1) 2 years after the discovery of the facts constituting the violation; or (2) 5 years after such violation." The district court held that, because Betz had inquiry notice of the defendants' violations of § 10(b) before July 11, 2001, Betz's claims were time barred, and on this ground the district court granted summary judgment for the defendants.

## II

We review de novo the district court's grant of summary judgment. *Olympic Pipeline Co. v. City of Seattle*, 437 F.3d 872, 877 n.11 (9th Cir. 2006). Federal Rule of Civil Procedure 56(c) entitles a party to summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." As we noted above, in deciding a motion for summary judgment, we view the evidence in the light most favorable to the nonmoving party. *Anderson*, 477 U.S. at 255.

## III

The defendants contend that Betz's suit is time barred because she had both actual and inquiry notice of the facts giving rise to her claim. Betz contends that she had neither.

[1] We first address actual notice. Betz's suit is timely only if she filed it "not later than . . . 2 years after the discovery of the facts constituting the violation." 28 U.S.C. § 1658(b). Viewing the facts in the light most favorable to Betz, there is a genuine issue of fact about whether Betz actually discovered that she had a claim against the defendants for securities fraud more than two years before she filed her suit on July 11, 2003. For Betz to have a claim under § 10(b), the defendants must

have had, among other things, scienter, which is the "mental state embracing intent to deceive, manipulate, or defraud." *See Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193-94 n.12 (1976); *see also Simpson v. AOL Time Warner Inc.*, 452 F.3d 1040, 1047 (9th Cir. 2006) (listing the elements of a federal securities fraud claim), *petition for cert. filed sub nom. Avis Budget Group, Inc. v. Cal. State Teachers Ret. Sys.*, No. 06-560 (U.S. filed Oct. 19, 2006). In *In re Silicon Graphics Inc. Securities Litigation*, 183 F.3d 970, 974 (9th Cir. 1999), we held that to adequately plead scienter, a § 10(b) plaintiff "must plead, in great detail, facts that constitute strong circumstantial evidence of deliberately reckless or conscious misconduct."

**[2]** We cannot say that, as a matter of law, Betz, before July 11, 2001, actually discovered that the defendants consciously or deliberately and recklessly deceived her. Under the version of facts presented by Betz, a reasonable factfinder could conclude that Betz did not discover that the defendants intentionally misled her into believing that she could withdraw $15,000 per month without depleting her principal until June 2002, when Moore told her that Trainer Wortham was "not going to do anything" to fix her account.

If the statute of limitations began running only upon Betz's actual discovery of the facts giving rise to her securities fraud claim, this would end our inquiry. However, the defendants contend that, even if Betz did not actually discover the facts underlying her claim before July 11, 2001, Betz was on "inquiry notice" of her claim before that date, and that her claim therefore is still barred by the statute of limitations. We address that argument in the next section.

**IV**

**A**

**[3]** We have held that the statute of limitations for a federal securities fraud claim begins to run when the plaintiff has either actual or inquiry notice that the defendants have made a fraudulent misrepresentation. *See, e.g.*, *Gray v. First Winthrop Corp.*, 82 F.3d 877, 881 (9th Cir. 1996); *Volk v. D.A. Davidson & Co.*, 816 F.2d 1406, 1412 (9th Cir. 1987). In more recent cases, however, it has been suggested that under the United States Supreme Court's decision in *Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson*, 501 U.S. 350 (1991), only actual notice of the facts forming the alleged fraud, and not inquiry notice of those facts, triggers the running of the statute of limitations for a § 10(b) claim.[2] *See Berry v. Valence Tech., Inc.*, 175 F.3d 699, 704 (9th Cir. 1999); *see also Livid Holdings Ltd. v. Salomon Smith Barney, Inc.*, 416 F.3d 940, 951 (9th Cir. 2005). The uncertainty introduced by our opinion in *Berry* led us to suggest in *Livid Holdings* that, notwithstanding our unequivocal pre-*Lampf* case law, we had "considered, but not made a final determination on whether actual or inquiry notice of the alleged fraud triggers the running of Rule 10b-5's statute of limitations." *Livid Holdings*, 416 F.3d at 951.

**[4]** In *Lampf*, the Supreme Court resolved a split among the circuits regarding the statute of limitations applicable to a § 10(b) claim. *See Lampf*, 501 U.S. at 354. Some circuits had borrowed state statutes of limitations, while others had established a unique federal limitations period. *See id.* at 354 n.1. The Supreme Court in *Lampf* held that the statute of limita-

---

[2]Though *Gray* was decided after the Supreme Court handed down *Lampf*, in *Gray* we applied pre-*Lampf* statute of limitations principles pursuant to 15 U.S.C. § 78aa-1(a), which provides that pre-*Lampf* limitations periods apply to suits filed before *Lampf* was decided. *See Gray*, 82 F.3d at 879 n.1, 880-81.

tions provided in § 9(e) of the Securities Exchange Act, 15 U.S.C. § 78i(e), was the appropriate standard. *See Lampf*, 501 U.S. at 364 n.9. Section 9(e) provides that "[n]o action shall be maintained to enforce any liability created under this section, unless brought within one year after the discovery of the facts constituting the violation and within three years after such violation."[3] No one disputes that "discovery" can occur when a plaintiff actually discovers facts giving rise to his or her claim. However, *Lampf* left it to the lower courts to decide whether "discovery" occurs *only* upon actual notice or whether "discovery" can occur on some form of inquiry notice.

[5] We hold that either actual or inquiry notice can start the running of the statute of limitations on a federal securities fraud claim. While it is unquestioned that actual notice can mark the beginning of the limitations period, two things happened in the aftermath of *Lampf* that convince us that an inquiry notice standard should also apply to federal securities fraud claims. First, the courts of appeal in our sister circuits, along with the district courts in our own circuit, have uniformly embraced inquiry notice. In fact, "every circuit to have addressed the issue since *Lampf* has held that inquiry notice is the appropriate standard." *Berry*, 175 F.3d at 704; *see Fin. Sec. Assurance, Inc. v. Stephens, Inc.*, 450 F.3d 1257, 1267-68 (11th Cir. 2006); *Shah v. Meeker*, 435 F.3d 244, 249 (2d Cir. 2006); *Glaser v. Enzo Biochem, Inc.*, 126 Fed. App'x 593, 597 (4th Cir. 2005) (citing *Brumbaugh v. Princeton Partners*, 985 F.2d 157, 162 (4th Cir. 1993)); *New England Health Care Employees Pension Fund v. Ernst & Young, LLP*, 336 F.3d 495, 500 (6th Cir. 2003); *In re NAHC, Inc. Sec. Litig.*, 306 F.3d 1314, 1325 (3d Cir. 2002); *Young v. Lepone*, 305 F.3d 1, 8 (1st Cir. 2002); *Ritchey v. Horner*, 244 F.3d 635, 638-39 (8th Cir. 2001); *Sterlin v. Biomune Sys.*, 154 F.3d

---

[3]The one year/three year limitations period set forth in § 9(e) still applies to securities fraud suits filed before the enactment date of Sarbanes-Oxley, July 30, 2002. *See* Sarbanes-Oxley Act § 804(b).

1191, 1199-1200 (10th Cir. 1998); *Marks v. CDW Computer Ctrs., Inc.*, 122 F.3d 363, 367 (7th Cir. 1997); *Topalian v. Ehrman*, 954 F.2d 1125, 1134-35 (5th Cir. 1992). Likewise, the district courts in our circuit regularly apply an inquiry notice standard to § 10(b) claims. *See, e.g.*, *In re Micron Techs., Inc. Sec. Litig.*, No. CV-06-085-S-BLW, 2007 WL 576468, at *4 (D. Idaho Feb. 21, 2007); *In re Immune Response Sec. Litig.*, 375 F. Supp. 2d 983, 1026 (S.D. Cal. 2005); *In re Infonet Servs. Corp. Sec. Litig.*, 310 F. Supp. 2d 1106, 1113 (C.D. Cal. 2003); *Getty v. Harmon*, 53 F. Supp. 2d 1053, 1055 (W.D. Wash. 1999); *Freedman v. La.-Pac. Corp.*, 922 F. Supp. 377, 395 (D. Or. 1996); *In re Syntex Corp. Sec. Litig.*, 855 F. Supp. 1086, 1099 (N.D. Cal. 1994), *aff'd*, 95 F.3d 922 (9th Cir. 1996); *Aizuss v. Commonwealth Equity Trust*, 847 F. Supp. 1482, 1486 (E.D. Cal. 1993). While not binding on us, the reasoned opinions of ten of our sister circuits and the widespread practices of the district courts in our own circuit weigh heavily in favor of holding that inquiry notice can trigger the running of the statute of limitations on a securities fraud claim. The uniformity of the precedent in this direction sends a signal message that inquiry notice, and not merely actual notice, can cause the statute of limitations for securities fraud to begin to run.

**[6]** The second post-*Lampf* event that convinces us that an inquiry notice standard is appropriate is an act of Congress. In the Sarbanes-Oxley Act of 2002, Congress extended the limitations period for § 10(b) suits from "one year after the discovery of the facts constituting the violation," 15 U.S.C. § 78i(e), to "2 years after the discovery of the facts constituting the violation" for actions commenced after July 30, 2002, 28 U.S.C. § 1658(b); Sarbanes-Oxley Act, § 804(b). In its new enactment, Congress opted for language identical to the language previously in effect in § 9(e) of the Securities Exchange Act, 15 U.S.C. § 78i(e). The Supreme Court has instructed that we should assume that Congress is aware of the prevailing case law and legislates in its light. *See Cannon v. Univ. of Chicago*, 441 U.S. 677, 696-97 (1979) ("It is

always appropriate to assume that our elected representatives, like other citizens, know the law . . . ."); *see also Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 379 (1982) (interpreting the Commodity Exchange Act in light of pre-enactment case law). In 2002, the prevailing case law in the lower federal courts interpreted the language of § 9(e) to mean that the limitations period could be commenced upon some form of inquiry notice. By choosing language nearly identical to the language of § 9(e), Congress implicitly approved of that case law. *See Cannon*, 441 U.S. at 696-99 (interpreting Title IX to provide a private cause of action because Congress used language identical to that found in Title VI, which had already been interpreted by the courts to provide a private cause of action); *Abrego v. Dow Chem. Co.*, 443 F.3d 676, 684 (9th Cir. 2006) (per curiam) (holding that the silence of the Class Action Fairness Act regarding the burden of proving removal jurisdiction indicated Congressional intent to leave intact the common law rule placing the burden on the defendant); *United States v. Male Juvenile*, 280 F.3d 1008, 1016 (9th Cir. 2002) (noting that "[i]n construing statutes, we presume Congress legislated with awareness of relevant judicial decisions" and holding that Congress's failure to explicitly include "tribal governments" within the Federal Juvenile Delinquency Act's definition of "State," when amending other parts of the Act, "may be interpreted as an endorsement of the judicial decisions excluding tribes from the definition of 'State' ").

**[7]** We recognize that the pragmatic effects of applying an inquiry notice standard to § 10(b) are both positive and negative for individual litigants. As was suggested in *Berry*, a case decided under the old one-year limitations period, such a standard may compel plaintiffs to file a suit based on "skimpy facts." *See Berry*, 175 F.3d at 704 n.6 (quoting Charles Benjamin Nutley, Comment, *Triggering One-Year Limitations on Section 10(b) and Rule 10b-5 Actions: Actual or Inquiry Discovery?*, 30 San Diego L. Rev. 917, 948 (1993)). However, Congress's extension of the relevant limitations period from

one to two years alleviates this concern and allows us to conclude that an inquiry notice standard strikes an acceptable balance between the interest in requiring plaintiffs promptly to file suit and the competing interest in avoiding the encouragement of baseless or premature suits by requiring plaintiffs to sue before they can discover the facts underlying their claims. *See New England Health Care Employees Pension Fund*, 336 F.3d at 501; *Young*, 305 F.3d at 9; *Sterlin*, 154 F.3d at 1202.

**B**

**[8]** We have previously stated that, if we were to adopt an inquiry notice standard for § 10(b) suits, we would apply a standard similar to that applied by the Tenth Circuit. *See Livid Holdings*, 416 F.3d at 951; *Berry*, 175 F.3d at 704. Today we adopt the inquiry-plus-reasonable-diligence test used by the Tenth Circuit. Under that standard, to determine when the statute of limitations begins running, we first determine when the plaintiff had inquiry notice of the facts giving rise to his or her securities fraud claim. A plaintiff is on inquiry notice when there exists sufficient suspicion of fraud to cause a reasonable investor to investigate the matter further. Like our sister circuits, we caution that inquiry notice should not be construed so broadly that the particular plaintiff cannot bring his or her suit within the limitations period. The facts constituting inquiry notice "must be sufficiently probative of fraud —sufficiently advanced beyond the stage of a mere suspicion . . . to incite the victim to investigate." *Fujisawa Pharm. Co. v. Kapoor*, 115 F.3d 1332, 1335 (7th Cir. 1997), *quoted in Tello v. Dean Witter Reynolds, Inc.*, 410 F.3d 1275, 1284 (11th Cir. 2005). Once a plaintiff has inquiry notice, we ask when the investor, in the exercise of reasonable diligence, should have discovered the facts constituting the alleged fraud. The answer to that second question tells us when the statute of limitations began to run.

**[9]** The question of whether inquiry notice exists is objective. *See, e.g.*, *Mathews v. Kidder, Peabody & Co.*, 260 F.3d

239, 252 (3d Cir. 2001); *Great Rivers Coop. of S.E. Iowa v. Farmland Indus., Inc.*, 120 F.3d 893, 896 (8th Cir. 1997). However, we would be remiss if we ignored the particular circumstances of the plaintiff in the limited cases where equitable considerations properly affect our view of limitations. For that reason, we have held that the running of the statute of limitations is tolled for a naive investor who is lulled into inaction by those that the investor alleges were defrauding him or her. For example, in *Vucinich v. Paine, Webber, Jackson & Curtis, Inc.*, 739 F.2d 1434, 1436 (9th Cir. 1984) (per curiam), the defendant argued that Vucinich's securities fraud, common law fraud, negligence, and breach of fiduciary duty claims were barred by the statute of limitations. *Id.* Vucinich, like Betz in this case, "had been receiving monthly statements which, had she been able to interpret them, would have indicated that the value of her account was declining." *Id.* Vucinich, again like Betz, claimed that "she could not decipher the statements and that she relied on [the defendant's] continuing reassurance that a longer time was needed to realize gains from [the defendant's] strategy." *Id.* Outside the limitations period, Vucinich had received several margin calls and been told by a friend that the investments the defendant had made for her were speculative. *Id.* At this point, one could argue that a hypothetical "reasonable investor" would have inquired as to whether her broker had been intentionally deceiving her. But we considered Vucinich's inexperience with investments, lack of financial sophistication, and reliance on the defendant's expertise and reversed the district court's grant of summary judgment to the defendant. *Id.* at 1436-37. We held that "[w]hether the events existing as of [the commencement of the limitations period] were sufficient to put Vucinich on notice and whether the reassuring statements of defendant reasonably affected that notice is a disputed question of fact requiring determination by the district court." *Id.* at 1437.

We have held that a primary purpose of the federal securities laws, and in particular § 10(b), " 'is to protect the inno-

cent investor, not one who loses his innocence and then waits to see how his investment turns out before he decides to invoke the provisions of the Act.' " *Volk*, 816 F.2d at 1413 (quoting *Stull v. Bayard*, 561 F.2d 429, 433 n.4 (2d Cir. 1977)). Ignoring the particular circumstances of the plaintiff and gauging the plaintiff's conduct entirely against that of an abstract "reasonable investor" would undermine this policy in cases where the plaintiff is an unsophisticated investor and the defendants by their words and conduct encourage inaction or delay.

Under the notice-plus-reasonable-diligence standard we apply to securities fraud claims, the defendant bears a considerable burden in demonstrating, at the summary judgment stage, that the plaintiff's claim is time barred. *See SEC v. Seaboard Corp.*, 677 F.2d 1301, 1309-10 (9th Cir. 1982) (noting that "the question of notice of fraud is for the trier of fact" and that "the party seeking summary disposition has an extremely difficult burden to show that there exists no issue of material fact regarding notice"). "Summary judgment is appropriate only when uncontroverted evidence irrefutably demonstrates plaintiff discovered or should have discovered the fraudulent conduct." *Gray*, 82 F.3d at 881 (internal quotations omitted); *see also Mosesian v. Peat, Marwick, Mitchell & Co.*, 727 F.2d 873, 879 (9th Cir. 1984) ("The question of what a reasonably prudent investor should have known is particularly suited to a jury determination."). Our hesitation to approve summary judgment in securities fraud cases is especially pronounced where the plaintiff alleges that the defendants' reassurances convinced the plaintiff to postpone his or her legal action. *See Vucinich*, 739 F.2d at 1436.

We now turn to the facts of this case. Under our inquiry notice standard outlined above, and keeping in mind that this case is before us on summary judgment, we ask whether there is a genuine dispute about whether there existed facts sufficiently probative of fraud to cause a reasonable investor to conduct a further investigation. Viewing the facts in the light

most favorable to Betz, a rational jury could conclude that a reasonable investor in Betz's shoes would not have initiated further inquiry before July 11, 2001.

[10] The defendants contend that the account statements Betz received would have spurred a reasonable investor to inquire further whether Trainer Wortham had defrauded her. However, the account statements indicated, at most, that the defendants had broken their promise that Betz could withdraw $15,000 per month from her account without depleting the principal. As a matter of law, we cannot say that a declining account balance, in and of itself, would have spurred a reasonable investor to further inquire whether he or she had been *defrauded*. *See Gray*, 82 F.3d at 881 ("It is well settled that poor financial performance, standing alone, does not necessarily suggest securities fraud . . . , but could also be explained by poor management, general market conditions, or other events unrelated to fraud, creating a jury question on inquiry notice."); *see also Livid Holdings*, 416 F.3d at 951 ("This court has held that financial problems alone are generally insufficient to suggest fraud.").

[11] Likewise, Castro's March 2002 statement that there was a "serious problem" with Betz's portfolio did nothing more than indicate to Betz that the defendants had not been able to make good on their promise of at least $15,000 per month in interest income. Because such a statement provided no evidence that the defendants had intentionally or deliberately and recklessly misled Betz as *Silicon Graphics* requires to state a claim for securities fraud, *see Silicon Graphics*, 183 F.3d at 974, a rational jury could conclude that, upon hearing such a statement, a reasonable investor would not have initiated further inquiry into the existence of fraud. *See Fujisawa Pharm.*, 115 F.3d at 1335 (noting that "[t]he facts constituting [inquiry] notice must be sufficiently probative of *fraud*" (emphasis added)).

Even if a reasonable investor would have initiated inquiry into the possibility of fraud, the assurances Betz received from the defendants tolled the statute of limitations on her securities fraud claim. When a defendant reassures a plaintiff that the defendant has not deceived the plaintiff and encourages the plaintiff to defer legal action, and the result is that the plaintiff postpones filing suit, we should be reluctant to grant summary judgment in favor of the defendant on statute of limitations grounds. *See Vucinich*, 739 F.2d at 1436. This holds especially true when the plaintiff is a naive investor, like Betz,[4] who enlists investment professionals and relies on those professionals' expertise, like Betz did. The case is entirely different for a sophisticated investor who would not normally be entitled to any equitable tolling of the limitations period. *See Davis v. Birr, Wilson & Co., Inc.*, 839 F.2d 1369, 1370 (9th Cir. 1988).

Moreover, even if Betz was on inquiry notice of fraud, under the second prong of our inquiry notice standard, we cannot say that, as a matter of law, Betz, in the exercise of reasonable diligence, should have discovered the facts constituting the alleged fraud. In this case, Betz questioned the defendants about her account and the defendants assured her that they would take care of any problems and asked her not to file suit. We have held that, when a plaintiff questions a defendant about possible fraud and receives reassurances

---

[4]No person with any degree of investment and financial sophistication could have believed that it was possible to receive $15,000 per month, or $180,000 per year, on a portfolio with capital value of $2.2 million, without some significant degree of market risk. Sophisticated investors know that a return exceeding 8% per year cannot be gained without a substantial risk, and the safest investments, in government notes, would likely return not more than half of that rate. When the facts are determined by trial, Betz's factual premises might be rejected, but in this case coming before us after a grant of summary judgment, we must accept as true Betz's testimony that she was told she could gain this level of monthly income with defendants managing her investments and without risking the capital she had gained on the sale of her house.

from the defendant, whether the statute of limitations began running is a question for the trier of fact. *See Seaboard Corp.*, 677 F.2d at 1310. In this case, "the question of what a reasonable investor would have done is not so certain as to allow a determination as a matter of law." *Id.*

## V

**[12]** In summary, we hold that, once there exists sufficient indicia of fraud to cause a reasonable investor to inquire into whether he or she has been defrauded, the statute of limitations on a claim under § 10(b) of the Securities Exchange Act begins running when the investor, in the exercise of reasonable diligence, should have discovered the facts giving rise to his or her claim. In this case, we cannot say that, as a matter of law, a reasonable investor in Betz's position should have discovered the facts giving rise to her claim before July 11, 2001. Moreover, the defendants' express assurances that they would remedy the problems with Betz's account lulled Betz, who was not a sophisticated investor, into inaction and thus tolled the statute of limitations on her securities fraud claim. We reverse the district court's judgment in favor of the defendants and remand this case for further proceedings consistent with our opinion.

**REVERSED AND REMANDED.**